2011 OK CR 14

Roderick Earsel **WEBSTER**, Appellant,

v.

**STATE** of Oklahoma, Appellee.

No. F–2009–834.

Court of Criminal Appeals of Oklahoma.

April 12, 2011.

Perry Hudson, Jason Spanich, attorneys at law, Oklahoma City, OK, attorney for defendant at trial.

Steve Deutsh, Jennifer Chance, Assistant District Attorneys, Oklahoma City, OK, attorneys for state at trial.

Jamie D. Pybas, Appellant Defense Counsel, Oklahoma Indigent Defense, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

SMITH, Judge.

¶ 1 Roderick Earsel Webster was tried by jury and convicted of First–Degree Murder, under 21 O.S.Supp.1988, § 701.7(A), in Oklahoma County, Case No. CF–2007–7326. In accord with the jury's recommendation, the Honorable Virgil Black, District Judge, sentenced Webster to life imprisonment without the possibility of parole. Webster appeals his conviction and is properly before this Court.

## FACTS

¶ 2 Shortly before midnight on the night of March 22, 1989, police were called to an apartment building at 2804 North Robinson, just north of downtown Oklahoma City. When Officer Brian Blosmo, the first officer to the scene, arrived around midnight, he found Lloyd Ballentine in Apartment 2, just inside the front door of the building, already being cared for by AmCare ambulance personnel. The apartment was totally black with darkness, with the only light coming from the flashlights of the emergency personnel and Blosmo himself.

¶ 3 Ballentine was sitting in a chair in the front room of the tiny apartment. He had an obvious head wound, and there was blood all over his head and face. He also appeared to have blood on his hands, forearms, and clothing, particularly his jeans. When Blosmo looked to his left, he saw the victim, Audrey M. Harris, lying crumpled up—and obviously dead—on the floor of a makeshift bedroom area, just past the main front room.[1] Blosmo testified that Ballentine seemed groggy and did not appear to have "his wits about him," which Blosmo attributed to the gash and lump on the right side of his forehead.[2] When Blosmo asked what happened, Ballentine indicated that he really didn't know, but that he and Harris had gone to bed around 11:00 p.m., and then he was awakened around 11:30 p.m., feeling like he had been hit on the head. By then other officers had begun arriving at the scene, and they quickly realized that the shadowy darkness of that tiny apartment was shrouding evidence of a homicide that was unlike any they had ever seen ... or would see again in the next twenty years.[3]

¶ 4 The evidence presented at trial revealed that Audrey Harris, age 75 years, and Lloyd Ballentine, age 49 years, had been living together for approximately nine years and considered themselves to be common-law married. Harris weighed 95 pounds, was 4 feet and 9 inches tall, was weak and in very poor health, and walked with a walker. Her body was found on the floor next to the only bed in the apartment, on her left side, with her dentures on the floor nearby. Harris was naked from the waist down. She was wearing only a multi-colored blouse and a ratty brown sweater, which had been pulled on over the blouse upside down (with the neck part at her waist) and backwards (with the back of the sweater on her front). The evidence indicated that Harris had been hit in the face, gagged, held down, cut open from vagina to rectum, penetrated by a broom, and completely disemboweled. She had bloody finger marks on her thighs, suggesting that her legs were pried apart during the assault; and the blood evidence in different areas of the apartment suggested that she was either moving or being moved during the attack.

¶ 5 The apartment shared by Ballentine and Harris did not have working electricity, and an extension cord running in the front door revealed that they were pirating power (apparently so Harris could watch television). The apartment was so dark that officers and investigators had to bring in external light sources in order to fully examine it and collect evidence. They could hardly believe what they found.

¶ 6 The largest concentration of blood was found in a small hallway just beyond the bedroom area, between a closet and the bathroom. Investigators testified that they believed this was the area where most of the attack occurred, where Harris was cut open, and where most of the disembowelment took place. A pile of bloody clothing was left on

---

1. The building at 2804 North Robinson was actually a large home that had been divided into eight apartments. The bedroom area in Apartment 2 appeared to have been a dining room originally.

2. Officer Dale Marshall, who arrived shortly after Blosmo, described Ballentine as "covered in blood" and "very confused, disoriented." Marshall noted that it "appeared that he had been in a fight."

3. The trial in this case was held in August and September of 2009, over 20 years later. Yet nearly every testifying witness who had been to the crime scene emphasized that he or she would never forget it. Blosmo testified, "This is the worst single case of violence I have ever seen in my life."

the floor, along with large pieces of human organs and tissue. There was obvious blood all over the hall carpeting, in front of and on the open closet door, into the next room where the body was found, and on the back hallway wall. Some of the organs and tissue appeared to have been thrown against the hallway wall and the closet door and were left along the hallway baseboard. The bed and the area next to it, where Harris' body was discovered, were also very bloody, as were the sheets, blankets, and clothing found in disheveled piles on the bed. A three-foot section of intestine was left hanging over the edge of the exposed, top-right corner of the blood-stained mattress.

¶ 7 Investigators recognized what appeared to be a series of bloody palm prints on the open closet door in the hallway, approximately 5 ½ feet up from the floor. A bloody fingerprint was also found on the closet door frame, approximately 14 inches up from the floor. All of these prints were photographed, and the entire closet door was removed and preserved.[4]

¶ 8 In the small bathroom off the hallway, investigators discovered a bathtub containing a pair of pink pants and two sets of footprints, which appeared to have been made by a single pair of athletic shoes. The tub was located below a window that opened out onto a small alley on the side of the apartment building. One of the sets of footprints was in mud, apparently coming into the apartment; the other was in blood, apparently going back out. In the alley outside, officers found corresponding footprints in the mud, mud on the wall below the window, and additional footprints that appeared to have blood mixed in them. Officers also discovered a container of baby powder, a disposable razor, and a buck knife on the ground below the bathroom window.

¶ 9 Chai Choi, the medical examiner, testified that the injuries to Harris' face indicated that she had been struck near her right eye and again on her right ear and that bruises and scratches around her mouth, along with petechiae on her face and neck, suggested

that someone had gagged her or forcefully covered her mourn. Harris' false teeth were missing, and she had bruising on both arms, consistent with being held down, and bruising on the top-side of both hands, consistent with someone who was trying to ward off blows or protect herself from an attack.

¶ 10 Choi testified that Harris' entire perineum had been cut open, from front to back, and that her whole pelvic cavity was open. Choi testified that Harris' entire urinary tract had been removed, along with her vagina, uterus, and most of her intestinal tract. Choi noted that a large portion of Harris' uterus, her bladder, a portion of her stomach, eleven separate segments of intestine, and nine pieces of fibril fatty tissue were recovered by officers at the scene and delivered to the medical examiner's office, along with the body. Choi testified that although some of Harris' organs and tissue appeared to have been cut, because of the "clean margins" at the point of detachment, other organs and tissue appeared to have been simply pulled from her body, as indicated by stretch marks and "irregular margins," and still others showed evidence of both cutting and pulling.

¶ 11 Choi noted that Harris had an internal puncture or "stab" wound to the left hemisphere of her diaphragm and to her left lung. Behind the front door of the apartment, investigating officers found a broom with a nail extending from the top of the broom handle, which was covered in Harris' blood to a distance of two feet and tested positive for fecal material. Choi acknowledged that while she could not determine what caused Harris' internal puncture wounds, the wounds could have been caused by the broom. Choi noted that some of the internal bleeding, particularly the blood trapped in the "tissue margins," indicated that Harris was alive when the gruesome attack and disembowelment began. Choi testified that Harris likely lost consciousness and went into shock during the assault, due to the amount of blood loss, and that she died as a result of the combined effect of numerous sharp and blunt force injuries, along with possible as-

---

4. Within the first few weeks of the investigation, the bloody fingerprint was matched to Ballentine, but it was determined that the bloody palm prints were inconsistent with both Ballentine and Harris.

phyxiation. Choi noted that Harris also had severe coronary artery disease, which was so bad that she could have died of a heart attack at any time.

¶ 12 From the earliest moments in the investigation, Lloyd Ballentine was regarded as the prime suspect in the Audrey Harris homicide. Brian Blosmo, the first officer to arrive at the scene, testified that he immediately regarded Ballentine as a possible suspect and that he did what he could to preserve evidence that may have been on him, including not allowing Ballentine to wash his hands. Blosmo also reminded Officer Mark Wood, who accompanied the AmCare ambulance to the hospital for treatment of Ballentine's head wounds, to make sure that Ballentine's clothing was properly obtained and preserved and that he was not allowed to "wash up" any more than was necessary for his medical care.

¶ 13 Mark Wood testified that he was the fourth Oklahoma City police officer to arrive at the crime scene and that he followed the AmCare ambulance to the hospital, where he carefully collected and maintained Ballentine's clothing and other evidence. Wood testified that Ballentine appeared to have been "severely beaten," that he had scratches on his back, and that the three gashes on his forehead had to be stitched. Wood further testified that Ballentine told him that he had been outside drinking with his friends from about 4:30 in the afternoon until 9:00 p.m. the previous night, when he came in, talked briefly with Harris, and then went to sleep on the bed, fully clothed, and wearing even his black leather shoes. Ballentine told Wood that he woke up around 9:30 p.m., feeling "like somebody was beating him," and that he then found Harris on the floor next to the bed.

¶ 14 Don Wilson, a technical investigator who took pictures of Ballentine at the hospital, noted that he looked like he "had been in

a good fight, a good hard fight." Wilson testified that Ballentine's fingernails were quite long, that his hands were dirty and grimy, and that there was a lot of black material under his fingernails.

¶ 15 After Ballentine was treated at the hospital, Officer Wood transported him to the homicide office at the Oklahoma City Police Department, where he was interviewed by Officers Bob Bemo and Mike Burke, who were the main homicide detectives on the case.[5] By agreement of the parties, the entire March 23, 1989, interview by Bemo and Burke, which lasted over four hours, was played for the jury during the early part of Bemo's trial testimony. Just before the interview was played, the jury was informed that both parties had agreed to show the entire interview and that Lloyd Ballentine had since died.

¶ 16 Ballentine's demeanor throughout the interview was docile, polite, soft-spoken, and respectful. He was obviously a simple, unsophisticated man, and was characterized by both parties at trial as, essentially, "a broken-down drunk."[6] During the interview Ballentine explained that he had been in a common-law marriage with Harris since 1980 and repeatedly described her as "a sweet old lady," though he was unable to give her actual age or date of birth. He described his wife as very weak and sick, noted that she had suffered heart attacks and a stroke, and that he did all the housework, because Harris "wasn't in shape to do anything. Poor little thing." Ballentine acknowledged that he had no job and no regular income, that he had been turned down for S.S.I., and that their main income was from Harris' S.S.I. check, plus some welfare. Throughout the interview Ballentine said things like "Sure going to miss her," and "Don't know why anybody would do anything like that." He maintained that he had never and would never hit Har-

---

5. Bemo and Burke were not normally partners, but were both on call on the night of the Harris homicide and were assigned to work together on it.

6. When asked to spell his name, Ballentine misspelled both his first and last name, spelling both with only one "l" instead of two. And it was more than 3 hours and 40 minutes into the

interrogation before he realized the officers suspected him and asked: "You officers don't really think that I murdered her myself do you?" This question came a full hour after Ballentine had voluntarily provided blood, saliva, and hair samples, including pubic hair samples, and been fingerprinted.

ris—though she would tell people that he did. He admitted to "pushing her a little," which could cause her to fall down, but then he would help her up. He also admitted they sometimes argued about his drinking.

¶ 17 When asked what had happened to Harris the preceding night, Ballentine consistently and repeatedly maintained that he did not know what happened or who had harmed her, that she was fine when he went to sleep, and that when he woke up, around 10:00 or 11:00 p.m., he discovered that he had been hit on the head, that his head was "busted wide open," and that Harris, who normally slept on the couch in the front room, was on the floor next to the bed where he had been sleeping, and that she was not breathing and had blood on her. Ballentine suggested that perhaps Harris had left the apartment door unlocked, as she had previously, and that someone had come in and attacked them both. He noted that when he found Harris, she was no longer wearing anything on the bottom and commented, "Why would somebody rape somebody that old?"

¶ 18 When asked to recount the entire previous day, i.e., the day of the murder, Ballentine stated that he was supposed to go to the doctor, but didn't want to go. Instead, he raked leaves for a woman named Dorothy Dean, to earn some money (to buy alcohol) and that he paid Leon Jones, his good friend and apartment neighbor, six dollars to take Harris to try to get her welfare check, so she could pay their gas bill. When he finished raking, Ballentine took the money he had made to a nearby liquor store and bought two bottles of "Wild Irish Rose" wine, one for Jones and one for himself. He then spent the early part of the afternoon, as was customary at 2804 North Robinson, sitting out back behind the building, drinking with his friends and neighbors.[7]

¶ 19 Ballentine maintained that he later went inside and talked with Harris, that one of their neighbors stopped by briefly, and that by around 3:00 p.m. he took three Dilantins (his seizure medicine) and went to sleep, while Harris remained awake and was sitting in her chair "watching her soap operas." He denied that he was drunk, but acknowledged that the Dilantin did make him extra sleepy. Ballentine stated that he slept on the bed in just his underwear, as he normally did, and that he left both his jeans and his shirt on the head of the bed, but that when he woke up his jeans were on the floor. Ballentine maintained that he did not see or hear anything unusual until he woke up around 11:00 p.m., with a bleeding head, a sore throat, and feeling like he was about to have a seizure.[8] He then put on his clothes, went to Leon Jones' apartment, and told Jones that he had found Harris on the floor and that she was "hurt and might be dead."[9] Jones then went next door to the home of James Smith, who was the apartment landlord and who had a working phone; and Smith called 911.

¶ 20 When asked if he had touched Harris, Ballentine stated that when he first woke up, he touched her on her left side, to see if her heart was beating, and that it wasn't beating. Ballentine denied touching Harris other than that, though he did describe looking around the apartment to try to figure out what had been used to hit both Harris and himself. Ballentine told the investigators that he had a long history of seizure problems and that he had had brain surgery within the past six months for these problems. Ballentine acknowledged that he had been having thinking and memory problems since the surgery and that shortly after the surgery, he had spent time living in an abandoned building, thinking that it was his own home.[10]

7. Ballentine listed Leon Jones, Sammy Davis, Diane Davis, and Joe James as people with whom he had been drinking the previous afternoon, which was subsequently confirmed by investigation.

8. During the interview Ballentine also pointed to one of his teeth, saying that it was sore and that it was "hanging" and had nearly been knocked out.

9. Jones told investigators that Ballentine arrived at his apartment that night with blood all over him and that Ballentine told him that he had been assaulted and Harris was hurt.

10. Subsequent investigation confirmed Ballentine's description of his surgery and the story about him mistakenly living somewhere else.

¶ 21 Over three hours after the interview began, the tone suddenly changed dramatically, as both Bemo and Burke began insisting that Ballentine was not being honest, that they knew what had really happened, that Harris' blood was "all over" him, that he had blood and "fleshy material" under his fingernails and on him when officers arrived, and that there was "no evidence to show anyone else was in that apartment." Ballentine was repeatedly told, "The evidence proves you hurt her," and "The evidence doesn't lie." By the end of the interview, Ballentine was sheepishly acknowledging that perhaps he had unwittingly done something to his wife or had a seizure and hit her, though he maintained, "If I did it, I don't remember it." Yet Ballentine did not appear to have any understanding of the true crime that had occurred. When Bemo at one point mentioned seeing "body parts," Ballentine responded incredulously, "Body parts? I don't remember seeing that." By the end of the interview, Ballentine seemed sincerely worried that he had harmed his wife, but remained insistent that he did not remember doing so.[11]

¶ 22 In the months following the homicide, the investigation focused on Ballentine and his relationship with Harris. Burke testified that he interviewed numerous persons about the relationship of Harris and Ballentine and that many of them said quite uncomplimentary things about Ballentine's treatment of his wife.[12] Burke noted that his investigation revealed that Diane and Sammy Davis had lived in Apartment 2 with Ballentine and Harris for three to four months, because they had nowhere else to stay, up until about a month before Harris was killed. Diane

Davis told Burke that Ballentine got drunk every day, was only sober when he was recovering from a seizure, and that he was normally quiet, but would get angry when Harris would provoke him by talking down to him and calling him names.[13] Diane Davis stated that although Harris told her that Ballentine would hit her and knock her down, she had never actually witnessed Ballentine harming Harris—though she once heard him threaten to "put a foot in her ass."[14]

¶ 23 Diane and Sammy Davis also told Burke that because they still had things in Ballentine's apartment (and were staying in essentially a tin shack), they would go there on almost a nightly basis to get clothing and clean up. In fact, Sammy Davis told Burke that around 10:00 p.m. on the night of the killing, Diane went to Apartment 2 to get some of her clothing, but that when she knocked on the door, Ballentine yelled out, "Don't open that door. Don't open that door." Sammy Davis also told Burke that he had heard Ballentine cuss at Harris, call her names, and even threaten to kill her if she didn't "shut up." Davis told Burke that he had seen Harris with bruises on her face and seen Ballentine push her down, but then he would help her back up.

¶ 24 Sammy Davis described Ballentine as "slipping" since his brain operation and seeing things and hearing things that weren't there. Leon Jones also told Burke that Ballentine's demeanor changed significantly after his brain operation, that Ballentine would forget what he was doing when he drank, and that he would "fuss" with Harris. Jones reported to Burke that he once overheard Ballentine tell Harris, "Shut up you motherfucker, or I will knock the shit out of you."

---

**11.** Late in the interview, Ballentine was saying things like, "Maybe I did do something, something I wouldn't do if I was in my right mind," and "God Almighty, sir. If I did it, I wasn't in my right mind." And when Officer Bemo was insisting that he had "done it," Ballentine remarked, "I can't say you're wrong. Does make good sense."

**12.** Mike Burke, who was the State's case agent and who ultimately became convinced of Ballentine's *innocence* (and Webster's guilt), was the final witness for the State. Nevertheless, he was forced to acknowledge, on cross examination, all the negative things that friends and acquain-

tances had said about Ballentine shortly after the 1989 killing.

**13.** Because of the many years that had passed since the Harris murder—and the number of witnesses who had died or become unavailable— the parties mutually agreed to the admission of much evidence that would typically be considered hearsay.

**14.** In a separate report, by a patrolman who had also interviewed Diane Davis, Davis was quoted as saying that she overheard Ballentine threaten to put "wood" inside Harris.

Burke noted that because Ballentine was so bloody and was thought to be the only other person in Apartment 2 on the night of the murder, "everybody" in the neighborhood initially believed that Ballentine had gotten mad at Harris and killed her.

¶ 25 On the other hand, during this same time period in 1989, Burke and other officers sought to find anyone in the area that matched the bloody palm prints on the closet door, which were determined by both the Oklahoma City police department and the F.B.I. *not* to match either Ballentine or Harris. They also tried to locate the shoes (or the wearer of the shoes) that had made the prints in the tub and in the dirt below the bathroom window. Officer Bill King testified that back in 1989, he was able to match the shoe print tread pattern to a "Winner's Choice" high top basketball shoe, which was being sold at area Wal–Mart stores at the time. King obtained a size 9 sample pair of these white basketball shoes at that time, which were preserved and entered into evidence at Webster's trial. Unfortunately, none of the numerous palm prints obtained that year matched the ones on the closet door; and no comparable shoes were ever found in the case, though investigators searched the entire apartment building and surrounding area looking for the shoes, as well as a possible murder weapon, which was also never found.

¶ 26 Meanwhile, Ballentine was charged with the first-degree murder of his common-law wife, Audrey Harris. The case proceeded to preliminary hearing in June of 1989, and Ballentine was bound over for trial. Mike Burke testified against Ballentine at the preliminary hearing, along with Oklahoma City police lieutenant Tom Bevel, who was already a recognized expert in bloodstain pattern analysis. Yet Burke later testified (during Roderick Webster's 2009 trial) that by the time of Ballentine's preliminary hearing, he was already becoming convinced that a third person was in the apartment on the night Harris was killed. In fact, Officer

Burke's doubts about Ballentine's guilt became so pronounced that he, along with Tom Bevel, met with prosecutor Barry Albert in 1990 and persuaded Albert to dismiss the case against Ballentine, who had already spent over a year in jail.

¶ 27 Officer Bob Bemo, on the other hand, who was originally the lead detective in the case, remained convinced that Ballentine was responsible for this most-grisly of crimes and was outraged about the dismissal. He remained both outraged and convinced of Ballentine's guilt even 20 years later, when he testified at Webster's trial. Bemo frankly acknowledged at trial that he was still angry at Burke for "going behind my back" to convince Albert to dismiss the case.

¶ 28 Bemo's testimony in this case was highly unusual. Although this long-time and well-regarded (now-retired) police officer was called as a State's witness, he was also listed as a defense witness; and he was clearly hostile to the State's case and the State's lead investigator, Mike Burke, who was sitting with the prosecutors at trial.[15] The entire March 23, 1989, interview of Ballentine by Bemo and Burke was played for the jury during Bemo's testimony. Afterward, Bemo testified that he "didn't believe anything [Ballentine] said" that night. The State then went back through Ballentine's interview, practically statement by statement, to force Bemo to acknowledge that subsequent investigation in the case had revealed that the overwhelming majority of Ballentine's statements turned out to be true (or at least not demonstrably false). Bemo was cross-examined about his insistence that he was *certain* that he saw Ballentine at the crime scene that night and that he specifically remembered that Ballentine was "bare-chested" and that he had "fleshy [human] tissue all over his chest area and down into the cuffs of his jeans." Yet the crime scene log and testimony from the first officers at the scene clearly established that Ballentine was transported to the hospital at 12:10 a.m., nearly two hours before Bemo arrived at the crime scene, at 2:05 a.m.[16]

15. In fact, at the end of his testimony, Bemo acknowledged that when he learned that Webster had been charged, he contacted Webster's attorneys on his own to offer to testify in Webster's

defense. Bemo noted that he had never previously testified on behalf of a homicide defendant.

16. Even when Bemo was presented with his own report from the early morning hours of March

¶ 29 Bemo was also cross-examined about his testimony that an officer at the scene advised him that Ballentine had been allowed "to wash his hands and arms up to his elbows"—a claim that all the testifying officers who were at the scene vehemently denied. Bemo was further questioned by the prosecutor about the numerous "lies" that were told to Ballentine during the videotaped interview: that fingerprints had been recovered from Harris' body, that Ballentine's blood was found on the outside of the bathroom window, that "fleshy material" was found in the clippings of Ballentine's nails, and that there was "no evidence to show anyone else was in that apartment besides yourself." [17]

¶ 30 In return, defense counsel sought to rehabilitate Bemo by bringing out evidence suggesting that Ballentine apparently had *not* been truthful about various things he said, such as how much he drank, how well he and Harris got along, that he never mistreated her, that he only touched her body one time. *etc.* Even at the end of his testimony, Bemo maintained that he personally did not believe there was "any possibility" that Ballentine was innocent and likewise that he was testifying for Webster because he was convinced of his innocence. And much of the State's case at trial appeared devoted to proving not merely that Webster was guilty, but that Bemo was *entirely wrong*, because Ballentine was totally innocent.

¶ 31 Ultimately, however, the resolution of Audrey Harris' murder and Webster's trial came down to forensic evidence. Burke testified that he never forgot the case or stopped trying to solve it and that he continued working in the homicide unit of the Oklahoma City Police Department until 2005, when he retired and began working as an investigator for the Oklahoma City District Attorney's Office. In 2003, Burke was assigned to work as a homicide detective in the Police Department's "Cold Case Unit"—and he later worked in collaboration with this same unit as a D.A.'s investigator. The unit was funded by a federal grant to review and attempt to solve "cold cases" through DNA analysis, which had emerged and gained general acceptance within the scientific and forensic community in the fourteen years since the Harris homicide.

¶ 32 That same year, 2003, Burke and Elaine Taylor, a forensic scientist in the DNA section of the Oklahoma City Police Department's serology lab, reviewed the preserved evidence in the Audrey Harris case to determine if there was any evidence that was suitable for DNA analysis. Burke and Taylor were particularly interested in some "frothy" material that was found on the tattered brown sweater worn by Harris, in the area covering her chest, which had been determined to be inconsistent with the ABO blood typing of both Harris and Ballentine.[18] In December of 2003, the material from the sweater, along with nail clippings from Harris and Ballentine, were sent to Orchid Cellmark, a laboratory in Dallas, Texas. A full DNA profile from an "unknown male" was obtained from the sweater sample, which did not match Ballentine or any other known person or profile at the time. Unfortunately, after that information was received, the case became cold again.

¶ 33 The big break in the case came in December of 2007. On December 12, 2007, Mike Burke contacted the O.S.B.I. latent print lab about re-testing the palm prints found at the 1989 crime scene in the O.S.B.I.'s Automated Fingerprint Identification System ("AFIS"). That same day O.S.B.I. latent print expert Jim Stokes contacted Burke back, to inform him that the

23, 1989, which noted that the "suspect had been taken to the hospital" before he arrived, Bemo was unmoved and stated, "I'm telling you when I arrived on the scene, ... Lloyd Ballentine was seated in that chair in the front living room."

17. It should be noted that Officer Burke also employed various factual misrepresentations during the interrogation of Ballentine, as both men attempted to obtain evidence and admissions from him.

18. Chai Choi described the material on the sweater as a "gray mucoid substance" that did not appear to be vomit and was more dense than saliva. Collette Callum described it as a "very weird stain" that looked like a "frothy mucus that had dried." Callum testified that although the material could not be identified when she first examined it in 1989, she took a cutting of it and preserved it in the freezer for future analysis.

AFIS system had matched one of the palm prints found at the scene to a man named Roderick Webster. An arrest warrant was issued the very next day, December 13, 2007. Officer Scott Cannon testified that he and another officer visited the Oklahoma City home of Webster's daughter that same day, but she denied her father lived with her.[19] When they came back the next day, however, they saw Webster through the door glass, as he ducked down behind a sofa. When they continued to knock, he came out, identified himself as Roderick Webster, and was arrested without incident.[20]

¶ 34 Webster was then taken to the police station, where he was interviewed by Investigator Burke and Detective Kyle Eastridge that same day, December 14, 2007. This interview was recorded, and a redacted copy of the interview was played for the jury at Webster's trial. The interview began casually, with the sweater-clad investigators and Webster all chatting about the recent ice storm and its impact. When Webster was asked about his basic information, he provided his correct birth date, July 26, 1955, but twice misspelled his own middle name (leaving out the "r" in Earsel), and indicated that he did not know his daughter's address or how to spell her name. Webster also stated that his mother, Willie Mae, had died around 30 years earlier, which was incorrect.

¶ 35 Webster was told that they had not filed charges against him, but that they wanted to talk to him because his name had "come up in a case," and that since he was there, they were going to read him his rights. After Webster was properly Mirandized, he responded affirmatively that he understood his rights and wanted to talk to them. He was then questioned extensively about his personal history. Though he struggled with his memory and exact dates and addresses, Webster provided a basic chronology of where he had lived and what he had been doing from 1972, when he quit high school during his junior year, up until the present. He noted that he had gotten married in 1977 and that he and his wife eventually had four children. Webster described working as a nurse tech in various nursing homes, starting in the early 1980's. He recalled that in 1989 he and his family were living in Oklahoma City at the 36th Street Apartments, at Prospect and N.E. 36th St.[21] He stated that the family moved to Wichita in 1991 or 1992, but then returned to Oklahoma in 1994 (living near Guthrie) and then to Oklahoma City in 1995.[22] Webster denied that he was a drinker, though he acknowledged drinking some in the past, and denied that he had ever used drugs.

¶ 36 When asked if he knew Lloyd Ballentine, Audrey Harris, Sammy Davis, and other residents of 2804 North Robinson, Webster denied knowing any of them. When asked about Leon Jones, Webster indicated that he knew a Leon Jones who worked at a body shop (who was his age, tall, and skinny), but denied knowing an older, short, black man named Leon Jones (the one who lived at 2804 North Robinson), though he hesitated during this questioning. When asked specifically and repeatedly about the area around 2804 North Robinson, Webster stated that he never hung out in that area. When he was told that the detectives had been told that he used to hang out there in 1989, Webster

19. Cannon noted that the Oklahoma City area was struggling with the aftermath of a massive ice storm at the time, that most of the area was without power, and that it was difficult to get around.

20. Webster was wearing size 10 ½ white, K–Swiss shoes at the time of his arrest. The State argued at trial that the recovered shoe prints may have been from a shoe slightly bigger than a size 9. The State also presented testimony from a podiatrist that feet sometimes get bigger over time and that people sometimes buy shoes in a size that is actually too big for them.

21. Burke testified at trial that subsequent investigation indicated that Webster was actually living at the Prince Hall Apartments at the time of the 1989 killing, located at 26th and North Kelly in Oklahoma City. Webster did talk about living at the Prince Hall Apartments in the early 1980's and then moving back there again when the family returned to Oklahoma City (from Wichita) in 1995.

22. Webster also noted that he was convicted of DUI and spent time in prison in the late 1990's, until 2001, and that he went to prison again in 2003 for a probation violation, for one year. These statements were redacted from the interview that was played at trial.

adamantly denied spending any time in that area or even going through the area. When asked if he carried a knife in 1989, he indicated that he used to carry a small pocket knife and that he sometimes kept knives in his car. After being asked if he ever shopped at Wal-Mart, Webster remarked, "I'd like to know where we're headed with this."

¶ 37 Shortly thereafter, Burke told Webster that his name had come up in an investigation into the 1989 killing of a lady at 2804 North Robinson. When Webster was again asked if he had even been in that neighborhood, he stated that he "never went down off in there," that he had no reason to go there, and that it was "too rough" in that area. At that point Burke talked to Webster about forensic evidence and told him that they had forensic evidence that he was there at the time the woman was killed and that they already *knew* he was there. Webster, who by this point was wiping sweat from his brow and squirming in his chair, repeatedly responded to this accusation by asking, "You saying I did it? What evidence is there?" At one point Webster asked if they were accusing him "because you found the knife—that belonged to me or something?" When asked what kind of knife he had at the time, Webster responded that he probably had a knife stolen out of his car, but didn't remember.

¶ 38 After Burke and Eastridge pressured Webster for a while, telling him that "evidence don't lie," referring to DNA evidence at the crime scene, stating that they knew what he had done and were just trying to understand why, noting that the victim was 75 years old, *etc.*, Eastridge said to him, "It's you. It's your evidence." Webster then turned and fell off his chair onto the floor. The parties dispute whether Webster actually passed out or not, but he definitely ended up on the floor and was unresponsive for a short time, and emergency personnel were alerted. Within a few minutes (and before any medical personnel arrived), Webster began talking and indicated that he sometimes passes out due to stress, that they were "coming at him," and also that he had back problems, especially when he sits for too long. While Webster was still on the floor, Eastridge began talking to him again, noting that the situation was "a lot to absorb," that they had "rock solid evidence" against him, that they knew he did it, which was stressful, and that it had been on his (Webster's) mind for a long time and he was "ready to get this out."

¶ 39 Shortly thereafter, fire department first responders arrived, examined Webster, took his vital signs, asked him if he had taken any medications, which he denied, and asked him what happened. Next EMSA paramedics arrived, who repeated the same basic procedure, this time using a portable heart monitor. Webster was responsive to all the emergency responders, repeatedly blamed his back and sitting still too long for the episode, indicated that he had fallen off the chair or "passed out" due to sudden back pain, and declined repeated offers to take him to the hospital. After confirming that Webster was fine, the paramedics left.

¶ 40 After allowing Webster a bathroom break, getting him water, and confirming that he was feeling "all right," the interview continued. Both Burke and Eastridge insisted that they already knew what Webster had done, due to the "advances of science," but wanted to know why it happened and if he was sorry for doing it. After a while Webster started saying that he was "sorry for whatever happened," but maintained that he couldn't remember what happened and also, "I don't know what I did to her." Webster kept asking what the evidence said he did and whether it said he "killed her," and after being told, again, that the evidence said he killed her and asked if he was sorry, Webster responded, "I'm sorry for killing her."

¶ 41 Burke then attempted to get Webster to tell him what happened and why it happened, but Webster wouldn't answer and just kept asking, "Is evidence saying I did this?" Webster then went back to saying that he didn't know what happened and didn't remember, and then that he lived in Wichita in 1989. When confronted with the fact that he had already apologized for killing the woman, Webster denied apologizing and went back to saying that he was sorry "about what happened, whatever happened," and asked again if the officers were saying it was "all on me."

After Eastridge responded affirmatively, the recording was abruptly cut off—since Webster asked for a lawyer at that point.

¶ 42 Hence Webster's jury was presented with the recorded images and audio of Webster repeatedly denying being anywhere near 2804 North Robinson in 1989, becoming increasingly nervous and agitated about possible evidence saying that he had killed a woman there, and eventually apologizing for killing the woman—before returning to denials that he was there and questions about what the evidence said he did. Yet the crux of the State's case against Webster was the forensic evidence against him.

¶ 43 Karen Smith testified that she had been a latent print examiner for the Oklahoma City Police Department for 28 years and that she had worked with Mike Burke on the Audrey Harris murder since the time of the crime. Smith testified that over the years, Burke had submitted "hundreds" of sample palm prints to her, looking (unsuccessfully) for a match with the latent prints found on the closet door. Smith testified that after the AFIS system came up with the name of Roderick Webster and he was arrested, she compared the three latent palm prints obtained from the closet door with the set of major case prints that she herself took of Webster after his arrest. Smith testified that she was able to identify two of the three latent palm prints as being made by the right palm of Roderick Webster.[23]

¶ 44 Michelle Reznicek, a latent fingerprint examiner for the F.B.I., testified about fingerprint evidence, how it is analyzed and used, and the F.B.I.'s IAFIS system (Integrated Automated Fingerprint Identification System). Reznicek confirmed that the F.B.I. was sent a photograph of a latent palm print from the Audrey Harris murder in 1989, which was "a high-quality print." The F.B.I. retained a photograph of this palm print evidence, after no match was found at the time. Reznicek testified that when the

F.B.I. was later sent the known prints of Roderick Webster, in 2008, she analyzed and compared the prints and came to the conclusion that the preserved latent print evidence was an exact match to the print of Webster. Reznicek noted that two other F.B.I. examiners had separately verified her "individualization" conclusion that the two prints matched.[24]

¶ 45 Finally, Elaine Taylor, who by 2008 was a senior forensic scientist in the Oklahoma City Police Department's serology DNA laboratory, testified that she conducted a DNA analysis on buccal swabs obtained from Roderick Webster after his arrest and compared it to the "unknown male" profile generated by Orchid Cellmark from the frothy material found on Harris' sweater. Taylor testified that Webster's DNA is an exact match to the DNA material found on the sweater.[25]

¶ 46 Before the palm-print match in 2007, Roderick Webster's name had never come up in the investigation of the Harris murder; and he was not known to have any connection to the neighborhood where the crime took place or to any of the people who lived there. Through subsequent investigation, however, the State discovered that Webster did have a connection to Ballentine's close friend, Leon Jones, who lived just down the hall. Kenneth Linn, a former Oklahoma City police officer, testified that on September 5, 1971, he stopped and arrested Willie Mae Webster, the defendant's mother, for speeding and driving under the influence. Linn testified that Leon Jones was a passenger in the car and that both Webster and the driver were "very intoxicated."

¶ 47 Xavier Webster, the defendant's brother, likewise testified that Leon Jones was their mother's boyfriend and that he and Roderick were close to Jones and would sometimes visit and spend time drinking with him at the apartment complex at 2804 North

---

23. Smith testified that the third print did not contain enough ridge detail to make an identification.

24. When Reznicek was asked if there was "any doubt" in her mind about the match, she responded, "No. There is no doubt."

25. Taylor further testified that the chances of finding another exact match of this same DNA profile within the African American community is 1 in 2,920,000,000,000,000.

Robinson. Xavier testified that Jones was "somewhat a stepfather" to himself and Roderick.[26] Charleszetta Jones (no relation to Leon Jones), who also lived at 2804 North Robinson in 1989, remembered that Leon Jones had "two sons," who used to come visit him sometimes. She had only met them once or twice and did not know if they were actually Jones' biological children.[27]

¶ 48 Webster's defense at trial was that there was reasonable doubt that he murdered Harris, because it was more likely that her husband, Lloyd Ballentine, committed this heinous crime. In fact, from beginning to end, the overwhelming majority of the testimony and evidence presented by the State related to its attempt to establish that Ballentine was *innocent* of the crime—while Webster's defense focused on establishing the likelihood that Ballentine was the *perpetrator* of this crime. And most of the big evidentiary battles at trial involved the interpretation of blood and other evidence found on Ballentine as either consistent with or indicating his innocence (the State's view) or suggestive of his guilt (the defense view).

¶ 49 Collette (Moriarity) Callum testified that she was a forensic chemist in the Oklahoma City Police Department forensic lab at the time of the Harris murder and that she responded to the crime scene and was involved in the collection, testing, and reporting of forensic evidence in the case. Callum testified about how blood evidence is identified and categorized and about the blood evidence in the case. She explained that the presence of fecal material can be determined through a test for urobilinogen, which is found in fecal matter, but that the test could only reveal the presence of fecal material, not link it to a particular person or even determine whether the fecal material was definitely human, rather than from an animal.

¶ 50 Callum testified that blood consistent with Harris and also fecal material was found on both of Ballentine's hands, underneath his fingernails on both hands, on his right heel, and on his long-sleeved, blue dress shirt. Testing of Ballentine's jeans, long underwear, t-shirt, socks, and black dress shoes also revealed substantial amounts of blood consistent with Harris, but no fecal material.[28] Blood found on Ballentine's underwear, however, was consistent only with his own blood type and tested negative for fecal material. Callum testified that blood found on the bathroom floor and on the bathroom window-ledge was consistent with Harris, but that blood found on the bathroom sink faucet was consistent only with Ballentine. Regarding the broom with the nail found at the scene, Callum testified that she found blood consistent with Harris and also fecal material on the broom handle, to a distance of over two feet. Callum noted that a paring knife found in Ballentine's jeans pocket at the time of his arrest and the buck knife found outside the bathroom window both tested negative for blood and fecal material.

¶ 51 Callum further testified that if Ballentine had been involved in disemboweling Harris and had not washed his hands, she would have expected to find "a lot more evidence" on his hands and under his fingernails, both blood evidence and fecal material.[29] She also testified that based upon the

**26.** Xavier Webster acknowledged on cross examination that he was incarcerated for a felony conviction at the time of trial (and was testifying as part of a deal), that their mother actually died in 1984 (5 years before the Harris murder), that in 1989 he was a regular user of crack cocaine, and that he was not "confident" about what time period he and his brother used to visit Jones at the apartment complex. Xavier noted on redirect that he kept in touch with Leon Jones after his mother's death and that he had attended Jones' funeral when he died.

**27.** Evidence was also presented that Willy Henderson, who knew Ballentine and lived in the neighborhood in 1989, was shown the sample pair of Winner's Choice basketball shoes by Officer Burke in 1990, and that he told Burke that Leon Jones' "stepson" (or "some type of relative") used to wear shoes like that—though Henderson did not remember this exchange the same way at trial.

**28.** Blood consistent with Harris was also found on Ballentine's black shoes, which were found near the bed in the room where Harris' body was discovered. There was blood on the outside of the shoes, on the soles of both shoes, and inside the left shoe.

**29.** DNA expert Matthew Dupont testified that the major DNA contributor to the material found under Ballentine's fingernails was Ballentine himself, though the minor DNA contributor pres-

number of nail clippings that did not show any fecal evidence, *i.e.*, 5 of the 11 tested, she did not think there was "a significant amount of feces under or on Lloyd Ballentine's fingernails." Callum likewise testified that since only 3 of the 14 areas sampled from Ballentine's dress shirt contained fecal material, there was "not a significant amount of fecal material" on his blue dress shirt.

¶ 52 Callum noted that she had been to the crime scene, which she described as "a very gruesome crime scene." She acknowledged that the blood and fecal material found on Ballentine was not consistent with him being simply "present" at the scene, but maintained that the forensic evidence was consistent with him being "assaulted," "pushed around," or "beaten up" within this grisly crime scene. Callum testified that she found only one piece of human tissue on Ballentine's clothing, which she found near the collar of his dress shirt, though she was aware of a separate piece of human tissue that had been retrieved off his jeans by Officer Ritchie. Callum concluded by testifying that the bloody palm prints found on the closet door were consistent with Harris' blood and tested positive for fecal material.

¶ 53 Finally, Tom Bevel, the bloodstain-pattern expert who got involved in the case in 1989, testified at Webster's trial that his analysis of the blood and clothing evidence in the case led him to the conclusion that Ballentine was "merely present" at the time Harris was disemboweled. Bevel testified about the blood found on Ballentine's clothing and how it might have gotten there. Bevel was vigorously cross-examined, however, about the fact that in June of 1989, he had testified for the State at Ballentine's preliminary hearing—though Bevel did not recall doing so. During the 1989 hearing, Bevel had testified that based upon his analysis of the blood evidence, Ballentine "certainly was involved in a portion of the attack" on Harris and that Bevel considered Ballentine to be "the perpetrator of those blows."

¶ 54 Although the State attempted to rehabilitate Bevel—by suggesting that he was able to review additional evidence in the case *after* the June 1989 preliminary hearing—Bevel was not able to establish what new evidence he had seen or why he had changed his conclusions. Bevel simply testified that he reexamined Ballentine's clothing on August 1, 1989, and that he later met with prosecutor Barry Albert and told Albert that he could not eliminate the possibility that Ballentine was merely present and not actively involved in the murder. Bevel testified that he was "apparently ... more objective" when he reviewed the evidence in August of 1989. Near the end of his testimony, Bevel acknowledged that the forensic evidence did not suggest that Ballentine was simply "lying in his bed the whole time," during the assault on Harris. Yet Bevel emphasized that Ballentine could have been "an active participant," and gotten Harris' blood and fecal material on himself, by "getting beaten" and being a victim himself.

## ANALYSIS

■■■ ¶ 55 In Proposition I, Webster argues that the trial court erred in admitting State's Exhibit 97, the recording of his December 14, 2007, interrogation by Investigator Burke and Officer Eastridge. Webster argues, in particular, that the admission of this videotaped interview violated the Fifth and Fourteenth Amendments of the U.S. Constitution and Article II, §§ 7, 20, and 21 of the Oklahoma Constitution. Webster maintains that the State failed to establish that his waiver of his *Miranda* rights was "knowing and intelligent." In addition, Webster asserts that the videotape should have been excluded because it contained improper and prejudicial statements and opinions by the investigators who interviewed him.

¶ 56 On August 26, 2009, the district court held a *Jackson/Denno* hearing to determine whether the recorded interview should be admitted at trial.[30] The judge noted that he had already watched the interview and that

---

ent in some of the samples was consistent with Harris. Dupont also testified that the fingernail evidence from Harris that was tested did not reveal any DNA from Ballentine.

**30.** *See Jackson v. Denno*, 378 U.S. 368, 385–87, 84 S.Ct. 1774, 1785–86, 12 L.Ed.2d 908 (1964).

he did not believe there was "a real medical emergency" when Webster fell to the floor, stating, "[I]t clearly was not." The recording shows that Webster was properly informed of his *Miranda* rights.[31] And Webster has been quite clear, both at the district court level and on appeal, that he is not challenging the voluntariness of his waiver of these rights. Rather, the issue before the court was whether Webster was capable of a "knowing and intelligent" waiver of these rights, due to his mental retardation.[32]

¶ 57 Investigator Burke was the only witness to testify at the hearing. He noted that he did not know Webster was mentally retarded at the time he interviewed him, but that he had since learned this fact.[33] Burke acknowledged that Webster had some problems with spelling and his memory during the interview, but denied that he had any reason to be concerned about Webster's comprehension of the *Miranda* warnings or his ability to respond appropriately to questioning. Burke noted that Webster recounted numerous places that he had lived, jobs that he had held, and cars that he had driven, and that his answers throughout the interview were appropriate and responsive to the questions being asked. At the conclusion of the hearing, the district judge noted that when he watched the interview, he "sure didn't see mental retardation," though he understood that Webster had been found to be retarded. The court then ruled as follows: "The totality of the situation is he clearly understood what the detectives [were] saying to him and clearly waived them. And then later on

when things weren't going well, he invoked his right to remain silent, okay. That's what it's all about." The Court then overruled Webster's motion to suppress the recording.[34]

■ ¶ 58 This Court finds that the district court properly denied Webster's motion to suppress the recorded interview. This Court recognizes that in order for a waiver of *Miranda* rights to be valid, the waiver must be both (1) *voluntary,* meaning "the product of a free and deliberate choice, rather than intimidation, coercion, or deception," and (2) *knowing and intelligent,* meaning "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[35] Webster acknowledges that his waiver was voluntary and challenges only the court's finding that it was "knowing and intelligent," due to the fact that he was not informed, at the beginning of the interview, what specific crime he was being questioned about and also his mental retardation.

■ ¶ 59 In *Colorado v. Spring,*[36] the Supreme Court held that law enforcement officers are not required to inform a suspect, at the outset of custodial questioning, about what crimes are being investigated and that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."[37] In *Coddington v. State,*[38] this Court

31. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Webster does not challenge the identification and background questions asked prior to his *Miranda* warning.

32. After a Bill of Particulars was filed in the case, Webster was evaluated by a psychologist, who reported that he had a "Full Scale IQ score of 67, which falls in the mildly mentally retarded range." The district attorney subsequently moved to dismiss the Bill of Particulars, thereby taking the death penalty off the table, "due to the defendant's mental retardation."

33. Defense counsel noted that he was not arguing that Burke knew or should have known that Webster was retarded, saying, "That's the problem with mild mental retardation, is it's not obvious."

34. This Court notes that although Webster's counsel had indicated at an earlier hearing that he would challenge comments by the investigators during the last 20 to 30 minutes of the interview as "prejudicial and irrelevant," counsel did not actually preserve this challenge at either the *Jackson/Denno* hearing or at the time the recorded interview was played at trial.

35. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986); *see also Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

36. 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

37. *Id.* at 576, 577, 107 S.Ct. at 858, 859.

adopted and invoked this holding.[39] And we continue to hold that the "relevant inquiry" for determining whether a waiver of *Miranda* rights is knowing and intelligent is simply "whether the suspect understands the rights at stake and the consequences of waiving them."[40] We decline Webster's invitation to revisit this issue.

¶ 60 Regarding Webster's mental retardation, this Court recognizes that a defendant's level of intelligence is a factor in determining whether that defendant's waiver of *Miranda* rights was knowing and intelligent.[41] Yet this Court rejects Webster's assertion that a person who has been deemed "mildly mentally retarded" is incapable of a knowing and intelligent waiver. In *Phillips v. State*,[42] this Court addressed this very issue and held that "unless an accused's degree of retardation is so great as to deprive him of the capacity to understand the meaning and effect of his confession, his deficient intelligence is but one factor to be considered within the totality of the circumstances in determining voluntariness and admissibility."[43] Upon a review of the recorded interview, this Court agrees with the trial court and finds that Webster's retardation was far from obvious and that although he did not appear to be a person of great intelligence (or a proficient speller or have a particularly good memory), Webster's responses during the interview repeatedly demonstrated that he was fully aware of what was going on, the situation that he was in, and what was at stake.

¶ 61 This Court does not hesitate to conclude that the record in this case supports the trial court's determination that Webster understood the *Miranda* rights that he had been read and that he likewise understood the potential consequences of his decision to waive these rights. The fact that Webster had previous convictions further supports our conclusion that Webster understood what was at stake.

¶ 62 Within Proposition I, Webster also criticizes the fact that he was not re-*Mirandized* after he passed out. Webster provides no authority for the assertion that the officers were required to re-read him his *Miranda* rights in this situation, and the videotape reveals that Webster remained fully aware of where he was and what was going on, even immediately after he "woke up." This Court need not determine whether or not Webster actually fainted to conclude that the brief episode after he fell out of his chair—during which he was provided with medical attention and repeatedly declined offers to take him to the hospital—did not require that Webster be re-*Mirandized.* Webster clearly remembered what was going on, and the interview essentially picked up where it left off. This Court notes that Webster also apparently remembered his *Miranda*-based right to the assistance of counsel, since he later asked for counsel: and the interrogation ended at that point.

¶ 63 Finally, Webster maintains that the interview had "no legitimate probative value" and should have been entirely excluded, or at least that it should have been redacted to remove "the repeated speculation and objectionable commentary by Detectives Burke and Eastridge." These claims were not preserved in the trial court, and this Court declines to find that the trial court committed plain error by failing, on its own motion, to insist that the now-challenged comments and characterizations be redacted.[44] This Court notes that the interview

**38.** 2006 OK CR 34, 142 P.3d 437.

**39.** *Id.* at ¶ 36, 142 P.3d at 448 (quoting *Spring,* 479 U.S. at 577, 107 S.Ct. at 859).

**40.** *Id.*

**41.** *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (determination of validity of consent to search involves assessment of "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation,"

and defendant's "low intelligence" is a factor in this determination).

**42.** 1982 OK CR 144, 650 P.2d 910.

**43.** *Id.* at ¶ 17, 650 P.2d at 913 (citations omitted).

**44.** *See Jackson v. State,* 2007 OK CR 24, ¶ 14, 163 P.3d 596, 601 (noting that objectionable portions of videotapes can often be redacted, but that "it is incumbent upon trial counsel to make specific objections to specific content of the videotapes and request that the objectionable content be redacted" (citations omitted)).

was very relevant and quite probative. Webster at one point apologizes for killing the woman at 2804 North Robinson, and his demeanor and discomfort as the interview progresses (including the possible fainting episode) are probative of his involvement and consciousness of guilt, as are his repeated denials of ever being anywhere near the scene of the crime—despite evidence that he used to visit Leon Jones there.[45]

¶ 64 Webster's jury, in particular, was unlikely to have been unfairly influenced by the negative characterizations and accusatory statements in Webster's 2007 interrogation, since this same jury had already seen one of these same investigators using these same tactics in the recorded interview of Lloyd Ballentine, from over 18 years earlier.[46] By the end of Webster's trial, his jury had substantial exposure to such tactics—as well as the fact that such tactics can lead to both fair and unfair determinations of a suspect's involvement and guilt. Hence Webster's Proposition I claim is rejected entirely. This Court finds that the trial court did not err in allowing Webster's jury to see the recording of his interview with investigators on the day he was arrested.

¶ 65 In Proposition II, Webster asserts that his trial was rendered fundamentally unfair by the admission of improper opinion testimony, which invaded the province of the jury and violated his constitutional right to a fair trial. Webster raises two distinct claims within this proposition. First, he challenges the testimony of the two latent fingerprint experts who testified, Karen Smith of the Oklahoma City Police Department and Michelle Reznicek of the F.B.I., asserting that scholarship in the last few decades and a recent report from the National Academy of Science have raised "serious questions about the validity and admissibility of fingerprint analysis," especially regarding claims that fingerprint analysis can "individualize" or decisively match an unknown print to a particular person. Second, Webster challenges the opinion testimony of several witnesses from the Oklahoma City Police Department, arguing that they were allowed to give expert opinion testimony on topics well beyond their actual expertise.

¶ 66 Regarding the latent print testimony of Smith and Reznicek that they had "matched" Webster's palm prints to one or more of the bloody palm prints found on the closet door at the crime scene, Webster acknowledges that he totally failed to preserve his current challenge in the trial court. Webster raised no objection to the latent print testimony at trial, nor did he provide the trial court with any of the materials that he is now attempting to invoke in this Court. Webster has also failed to follow the proper procedure for supplementing the record in this Court with this kind of evidence.[47] Nevertheless, Webster argues that "this Court should hold that claims of latent print individualization are not scientifically supported and should not be admissible in Oklahoma courts." As the State notes in its brief, Webster is essentially making a *Daubert* claim about the scientific reliability of an entire field of expertise.[48] Yet he totally failed to preserve this claim in the trial court.

¶ 67 As Webster acknowledges, fingerprint evidence has long been recognized, in this State and around the world, as a remarkably powerful tool of identification. In 1930, this Court asserted that fingerprint evidence has "long been recognized as the strongest kind of circumstantial evidence and the surest

45. *See Coddington*, 2006 OK CR 34, ¶ 86, 142 P.3d at 459 ("Videotaped confessions ... are regularly admitted to show the jury the demeanor of a person and the circumstances under which confessions are made.").

46. This Court acknowledges that comments and commentary by investigators during a custodial interview can be improperly prejudicial and that it is often wise to redact such comments or at least explicitly admonish the jury to disregard them. *See, e.g., Darks v. State*, 1998 OK CR 15, ¶¶ 14–15, 954 P.2d 152, 158 (where prosecutor conceded that various statements by interviewing detectives were irrelevant and potentially prejudicial, and trial court admonished accordingly).

47. *See* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2010).

48. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

form of identification."[49] And Webster fails to cite any jurisdiction that has actually held, as he suggests this Court should hold, that latent print individualization testimony, *i.e.*, claims of a unique "match" to a particular individual, is so scientifically unreliable as to be inadmissible.[50] The State acknowledges that Webster could have used the materials now put forward to cross examine Smith and Reznicek about the meaning and reliability of their "match" conclusions—in particular, Reznicek's assertion that "[t]here is no doubt" about her conclusion that the bloody palm prints came from Webster. Yet Webster failed to do even this.

¶ 68 Consequently, this Court declines to further address this claim, except to find that there was certainly no plain error in the admission of the latent print testimony at Webster's trial.[51] This Court notes that the current case is *not* one where fingerprint identification testimony could plausibly have resulted in a mistaken identification or wrongful conviction, since the fingerprint testimony identifying Roderick Webster as the source of the bloody palm prints at 2804 North Robinson was decisively confirmed by the subsequent finding that the frothy substance on the victim's sweater was an exact DNA match to Roderick Webster. Webster had no legitimate reason to be in the victim's

apartment, and he repeatedly denied even being in that neighborhood in 1989. The DNA match, about which Webster raises no challenge, conclusively established that Webster was at the crime scene and confirmed the accuracy of the earlier palm print testimony.[52] The latent print testimony in this case did not erroneously identify Roderick Webster or prejudice his right to a fair trial.

¶ 69 In the second half of Webster's Proposition II claim, he challenges portions of the testimony of Don Wilson, Collette Callum, and Elaine Taylor as constituting improper expert testimony. In 1989, Don Wilson was a technical investigator (or crime scene investigator) for the Oklahoma City Police Department, and on March 23, 1989, he took pictures of Ballentine at the hospital and then took pictures and helped collect evidence at 2804 North Robinson. Wilson's trial testimony covers over 150 transcript pages.[53] Wilson was apparently discovered as a significant witness just before Webster's trial, though he testified that he had kept a full set of crime scene photographs in his desk drawer over the years, because he was so troubled by "the nature of the crime and it not being prosecuted." Wilson testified—at length, in detail, and over repeated defense objection—that, based upon his own observations of both Ballentine and

**49.** *See Stacy v. State*, 49 Okl.Cr. 154, 157, 292 P. 885, 887 (1930).

**50.** *But see United States v. Mitchell*, 365 F.3d 215, 220–30, 234–46 (3rd Cir.2004) (describing basics of latent print identification, summarizing extensive *Daubert* hearing held in district court, applying *Daubert/Kumho* analysis, and concluding that district court did not abuse its discretion in admitting latent print identification evidence and recognizing field as appropriate for expert testimony, as field of technical or other specialized knowledge, regardless of whether latent print identification constitutes "a science"); *United States v. Baines*, 573 F.3d 979, 981–92 (10th Cir.2009) (describing basics of fingerprint identification, summarizing *Daubert* hearing held in district court, applying *Daubert/Kumho* analysis, and concluding that district court did not abuse its discretion in admitting fingerprint analysis evidence, because record supports court's finding that "fingerprint analysis is sufficiently reliable to be admissible.").

**51.** *See Stouffer v. State*, 2006 OK CR 46, ¶ 74, 147 P.3d 245, 265.

**52.** Webster acknowledges in his brief that the same study that questioned the empirical basis for claims of individualization by latent print analysis recognized DNA analysis as a forensic assay for which such claims have been empirically verified. And even Webster does not make the argument that after first identifying him through the latent print evidence, it was just a coincidence that his DNA was at the scene as well. In fact, during closing argument defense counsel conceded, due to the forensic evidence, that Webster was present at the crime scene: "He's present. All right, he's present.... There's a bloody palm print, it's his. There's DNA, it's his."

**53.** Defense counsel vigorously objected to Wilson's testimony at trial, arguing that he was not given fair notice of the nature and extent of Wilson's testimony and that the testimony itself was improper. After the first day of Wilson's testimony, however, defense counsel was given the opportunity to interview Wilson, and counsel's objections thereafter focused on the content of his testimony.

the crime scene, he had doubts about the Bob Bemo/Ed Johnson theory that Lloyd Ballentine was the sole killer of Audrey Harris even on that first night of the investigation.[54] In fact, the State was able to use Wilson's testimony to review and summarize practically everything that was inconsistent, weak, or inconclusive about the State's evidence against Ballentine (and to further undermine Bemo).[55] Although the trial court sustained an objection to Wilson summarizing his ultimate conclusion—that the "simple domestic killing" theory "just didn't stand up"—after defense counsel argued that Wilson "has become an expert in every field we have in law enforcement," few limits were placed on Wilson's extensive and wide-ranging "expert testimony" at trial.[56]

¶ 70 Regarding forensic chemist Collette Callum, Webster has never challenged her basic testimony about the blood, fecal, and other forensic evidence found at the crime scene and on Ballentine. Webster did, however, vigorously object to some of the "expert" conclusions that Callum was allowed to draw from this evidence. In particular, Webster objected to Callum's testimony that even though Ballentine had blood consistent with Harris and fecal material on both of his hands and underneath fingernails on both hands, she would have expected to find "a lot more" of this blood and fecal evidence, as well as "flesh," under Ballentine's fingernails, if he had been directly involved in disemboweling Harris and had not washed his hands. Callum was also allowed to testify, over objection, that she would expect that the person who disemboweled Harris would have "stuff all over them," including feces, human flesh, and blood. In addition, she was allowed to testify, over objection, that the forensic evidence found on Ballentine was consistent

with him being "assaulted," "beaten up," or "pushed around" in the crime scene.

¶ 71 Regarding Elaine Taylor, Webster did not and does not challenge the testimony of this senior forensic scientist that the DNA profile generated from the frothy material found on Harris' sweater is an exact match to the DNA of Webster. Nor does Webster challenge Taylor's testimony that even though Harris' DNA was found under the fingernails of Ballentine, it was not the "predominant" DNA there. Webster does challenge, and objected at trial to, Taylor's further testimony that she would have expected Harris' DNA to be predominant under Ballentine's nails (over Ballentine's own DNA), if he had disemboweled her.

¶ 72 This Court finds that the expert testimony in this case was allowed to exceed the acceptable limits for such testimony. This Court has recognized that an "expert witness" is someone with specialized knowledge in a particular field, who has acquired this knowledge through study, training, experience, or a combination of these, and "who has experience and knowledge in relation to matters [that] are not generally known."[57] Scientists have long been recognized as capable of giving expert testimony, and this Court has recognized that police officers are likewise capable of giving expert testimony, based upon their experience and specialized training.[58] Nevertheless, the expert testimony in this case went too far. Technical investigator Wilson should not have been allowed to testify as an "expert" in the overall strength and validity of the State's original case against Lloyd Ballentine. This Court notes that much of Wilson's "expert" testimony was based not on "specialized knowledge" or experience, but rather on logic and common sense.

---

54. Ed Johnson (who died prior to trial) was a civilian technical investigator who worked with Wilson in the collection and photographing of evidence at 2804 North Robinson. Wilson noted that both Johnson and Bemo were convinced from the start that Ballentine was the perpetrator.

55. Wilson was also allowed to testify about his own theory of the case, over defense objection, that the attack on Harris was sexually motivated.

56. At the conclusion of Wilson's direct testimony, defense counsel unsuccessfully sought a mistrial.

57. *See Andrew v. State*, 2007 OK CR 23, ¶ 79, 164 P.3d 176, 195 (citing *Kennedy v. State*, 1982 OK CR 11, ¶ 27, 640 P.2d 971, 977).

58. *Welch v. State*, 2000 OK CR 8, ¶¶ 22–23, 2 P.3d 356, 369.

¶ 73 In addition, Callum and Taylor should not have been allowed to testify as "experts" in how *much* forensic evidence one would expect to find under the fingernails of a person who had disemboweled another person, *i.e.*, that they would have expected *more* of such evidence underneath Ballentine's nails if he had disemboweled his wife, when neither witness claimed to have any actual prior experience or specialized training in disembowelment cases. This Court finds that the trial court abused its discretion in allowing Wilson to testify so comprehensively and generally, over repeated defense objection, and that the court also abused its discretion in allowing Callum and Taylor to testify so specifically, and over objection, as if they were experts in the field of "disembowelment forensics." [59]

¶ 74 Nevertheless, this Court does not hesitate to find that this improper expert testimony did *not* affect Webster's conviction in the current case. This Court notes that all of the challenged expert testimony related only to the State's attempt to establish that Lloyd Ballentine was *innocent* of the murder of his wife. The challenged testimony was *not* part of the State's evidence that Roderick Webster was guilty of this murder, which came down to, in essence, his palm prints and his DNA, at a place where he claimed never to have been, and on a victim he claimed never to have met. Hence this Court finds that any errors in the admission of expert testimony in this case were harmless beyond a reasonable doubt. [60]

¶ 75 In Proposition III, Webster claims that his right to a fair trial was violated by the introduction of fifteen "gruesome photographs" of the victim, the crime scene, and various pieces of human organs and tissue found at the crime scene. Webster argues, in particular, that State's Exhibits 22–26, 31, 32, 37–41, 43, 45, and 46 were all substantially more prejudicial than probative and should have been excluded from his trial. Webster properly preserved this challenge at trial.

¶ 76 This Court has consistently held that the "test for admissibility of photographs is not whether they are gruesome or inflammatory, but whether [their] probative value is substantially outweighed by the danger of unfair prejudice." [61] We have recognized that even highly disturbing photographs can be admissible in order to show the nature, extent, and location of the victim's wounds, to establish the corpus delicti, to corroborate the testimony of the medical examiner and other witnesses, and to show the crime scene. [62] We have also consistently recognized that whether to admit photographs of a homicide victim and the crime scene in which the victim was found is a case-specific, discretionary determination by the trial court, which this court will not disturb absent an abuse of that discretion. [63]

¶ 77 In the current case, State's Exhibits 22–26, 31, and 32 were introduced in conjunction with the testimony of Officer Brian Blosmo. Exhibits 22–26 depict the bruised and bloody victim, who is naked from the waist down, from five different perspectives. The photographs show how the victim was found at the crime scene and her immediately visible injuries. Exhibits 31 and 32 show two views of the hallway area and some of the bloody clothing, blood spatter, and organs/tissue found there. State's Exhibit 37 was introduced in conjunction with the testimony of Officer Don Wilson and depicts a different view of the hallway area and some of the other organs/tissue found there.

¶ 78 State's Exhibits 38, 39, 40, 41, and 43 are all pictures of the organs and tissue that were found in the crime scene, being held up by the gloved hand of one of the investiga-

**59.** *Williams v. State*, 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724.

**60.** *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

**61.** *See, e.g., Lockett v. State*, 2002 OK CR 30, ¶ 19, 53 P.3d 418, 425 (quoting *Hooks v. State*, 1993 OK CR 41, ¶ 24, 862 P.2d 1273, 1280).

**62.** *See Livingston v. State*, 1995 OK CR 68, ¶ 20, 907 P.2d 1088, 1094; *Lockett*, 2002 OK CR 30, ¶ 20, 53 P.3d at 425 (quoting *Smallwood v. State*, 1995 OK CR 60, ¶ 33, 907 P.2d 217, 228).

**63.** *See Lockett*, 2002 OK CR 30, ¶ 19, 53 P.3d at 425; *Hooks*, 1993 OK CR 41, ¶ 24, 862 P.2d at 1280.

tors at the scene. Dr. Chai Choi testified that Exhibits 38 and 43 depict long portions of small intestine and that the intestine appears to have been both pulled and cut from Harris' body. Choi described Exhibits 39 and 41 as showing pieces of soft tissue found at the scene, which appeared to have been pulled from the victim's body. Choi further testified that the large piece of soft, fibrous tissue depicted in Exhibit 40 showed evidence of being both pulled and cut from the victim. This Court notes that although these "hand-held" pictures are particularly disturbing, the photographs of these same organs and tissues as they were found in the crime scene are otherwise hard to even discern. This Court further notes that by contemporary standards, the photographs that were introduced at Webster's trial (but taken in 1989) are of rather poor quality, which actually mitigated some of the gruesomeness of what was shown therein.

¶ 79 Finally, Exhibits 45 and 46 are photographs of the victim taken after she had been placed on a sheet, before being transported to the morgue. Exhibit 45 is a close-up picture of the victim's face and a portion of her brown sweater. Exhibit 46 is a photograph of the area between the victim's legs, which is being held open by a field agent at the scene, to show how the victim has been cut and torn open.

¶ 80 It goes without saying that such photographs are indeed gruesome, hideous, and highly disturbing.[64] Nevertheless, this Court does not hesitate to conclude that the district court did not abuse its discretion in admitting all of them. They were not improperly cumulative or unfairly prejudicial, and they accurately depicted the reality of the defendant's crime, what he did to the victim, and how he left the crime scene.[65] Hence their probative value was not substantially out-weighed by their potentially prejudicial effect, and the trial court did not abuse its discretion in admitting them. This claim is rejected entirely.

¶ 81 In Proposition IV, Webster raises a two-part prosecutorial misconduct claim. First, he argues that the prosecutor committed misconduct during her final closing argument, due to her graphic characterizations of his actions and her assertion that the crime was sexually motivated. Second, Webster argues that the State violated the rules of discovery and his right to a fair trial by failing to fairly disclose the full extent of the "expert testimony" of Officer Don Wilson and forensic scientists Collette Callum and Elaine Taylor (as discussed earlier in the second part of Webster's Proposition II claim). We evaluate such claims to determine whether the challenged actions so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon.[66]

¶ 82 Webster maintains that the State should not have been allowed to argue that the murder of Audrey Harris was sexually motivated and challenges two specific statements made during final closing argument. First the prosecutor argued, "This is not about death, this is about the process, this is about the assault. This is about reaching up inside of her. This is about shoving a broomstick up her. If that is not a sexual assault, what is?" Defense counsel's objection to this argument was overruled, and the prosecutor later continued this theme, saying, "This is I reached up inside of her and I grabbed her and I yanked her out, and I slobbered all over her like a rabid dog." Defense counsel's objection to this characterization was likewise overruled.

---

**64.** As this Court has often remarked, "gruesome crimes make gruesome photographs." *See, e.g. Livingston*, 1995 OK CR 68, ¶ 20, 907 P.2d at 1094 (citing cases).

**65.** *See DeRosa v. State*, 2004 OK CR 19, ¶ 73, 89 P.3d 1124, 1150 (finding that district court did not abuse its discretion in admitting pictures depicting "the handiwork" of defendant and his cohort).

**66.** *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974) (consider whether challenged conduct made trial "so fundamentally unfair as to deny [defendant] due process"); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *DeChristoforo* )).

¶ 83 Webster's claim that the State should not have been allowed to argue that the crime was sexually motivated is based upon an exchange that occurred during the State's opening argument, after defense counsel objected to the prosecutor's statement that "Lloyd Ballentine did not climb in his own window to rape and murder and disembowel his wife." This statement was immediately followed by an objection and bench conference, in which defense counsel argued that "rape" had not been alleged in the case, sought a mistrial, and asked for an admonishment. After telling the State that it needed to "clear that up," the prosecutor argued, "Mr. Ballentine did not climb in his own window that night to shove a broomstick up his wife and to pull out her organs." Defense counsel did not object to this argument, and the court later admonished Webster's jury that the case before them was "not a rape case" and that the defendant was "not charged with rape."

¶ 84 Webster infers from this early sequence of events that the trial court somehow ruled that the State could not assert that the murder and disembowelment of Harris was sexually motivated. This Court does not interpret the trial court's actions this way, nor would it have been appropriate for the trial court to limit the State's theory of the case in this way. Although it seems impossible to "make sense" of what Roderick Webster did to Audrey Harris on the night of March 22, 1989, the State's theory that the disembowelment and the apparent shoving of the broom up inside of Harris was, at least in part, sexually motivated was not implausible and was supported by evidence at trial, including the blood and fecal-covered broom.

¶ 85 This Court finds that the prosecutor's arguments, though graphic and hard-hitting, were not unfair or inappropriate. Although the comparison of Webster during the disembowelment to a slobbering, "rabid dog" nearly crosses the line, in a case where the defendant leaves his "froth" upon the chest of the victim, who he has disemboweled with his own hands, it is hard to find that even this characterization went too far. The prosecutor's remarks certainly did not render Webster's trial unfair, nor did they render his conviction or sentence unreliable.

 ¶ 86 Finally, Webster argues that the State committed prosecutorial misconduct by failing to disclose (1) that Wilson would testify about his disagreement with the "husband-did-it" theory of the case and his own theory of the crime, and (2) that Callum and Taylor would testify that there was not "enough" forensic evidence under Ballentine's fingernails to suggest that he had disemboweled his wife. This Court has already found, in Proposition II, that portions of the testimony of these witnesses surpassed the boundaries of proper expert testimony. Since this Court has already found that this same testimony, or at least portions of it, should not have been admitted, we need not further attempt to define precisely how much notice the prosecutor should have given regarding this same testimony. Nevertheless, it should be said that the prosecutor's notice regarding these witnesses (particularly Wilson) was not as specific or as comprehensive as it should have been, consistent with the defendant's right to fair notice and a fair trial.[67]

¶ 87 This Court declines to find prejudicial prosecutorial misconduct in this regard, however, because we are convinced that the "undisclosed" testimony did not render Webster's trial unfair or the verdict against him unreliable. Defense counsel was given an opportunity to fully interview Wilson during the time period of his trial testimony—after learning the extent of his intended testimony—in time to react, object, and respond to this testimony at trial, particularly through cross examination. This Court is convinced that Webster's trial, though not perfect, was quite fair and that the jury's guilty verdict and sentence of life without parole in this case were both reliable and fair. Webster's

67. *See* 22 O.S.Supp.2002, § 2002(A)(1) and (C); *see also Stemple v. State,* 2000 OK CR 4, ¶ 27, 994 P.2d 61, 68 (noting that although the State "is not required to give a script of its case in chief," a failure to fully disclose evidence prior to trial could be error "when this evidence is material, would change the theory of the case or would cause the defendant to change his strategy").

Proposition IV misconduct claim is rejected accordingly.

¶ 88 In Proposition V, Webster raises a cumulative error claim.[68] This Court has found error regarding the admission of certain expert testimony in Proposition II and also noted, in Proposition IV, that the State failed to give fair notice of some of this testimony prior to trial, though this failure did not constitute prosecutorial misconduct. This Court now finds that even considered in combination, any errors or misconduct committed during the course of Webster's trial did *not* render his trial unfair or in any way affect the verdict and sentence in this case.

¶ 89 By the end of Webster's trial, the State seemed to have fully assumed the mantle of proving Lloyd Ballentine entirely innocent, in addition to proving that Roderick Webster was guilty. Yet the State was *not* actually obliged, under the law or pragmatically, to answer, rebut, or counteract every piece of evidence that implicated Harris' common-law husband. This Court notes that the length and complexity of this trial, and most of the claims on appeal, are a direct result of the State's determined effort to decisively "acquit" Ballentine, in addition to convicting Webster. While the State certainly had to deal with the evidence implicating Ballentine (and the retired police officer still convinced of his guilt), this Court finds that the State overestimated this task and "overworked" this case in this regard.

¶ 90 Once again, the case against Webster was fairly simple: his palm prints in the victim's blood at the crime scene, his DNA on the froth on the victim's sweater, and his statements to investigators after his arrest, including his apology "for killing her." This Court does not hesitate to conclude that Webster was fairly and properly convicted and that both his conviction and his sentence should be affirmed. Hence, after thoroughly considering the entire record before us on appeal, including the original record, transcripts, briefs, and exhibits of the parties, we find that neither reversal nor modification is required by the law or evidence.

**Decision**

¶ 91 The Judgment and Sentence of the District Court of Oklahoma County convicting Webster of Murder in the First Degree and sentencing him to Life in Prison Without Parole is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., LEWIS, V.P.J., and C. JOHNSON, J.: concur.

LUMPKIN, J.: concur in results.

LUMPKIN, J.: Concur in Results.

¶ 1 I concur in the result reached by the Court but I take exception on a couple of issues.

¶ 2 First, I disagree with the Court's handling of the testimony by the forensic investigators/scientists Don Wilson, Collette Callum and Elaine Taylor in Proposition II. Each of these expert witnesses testified to what they observed and based on their experience what they had expected to find in this type of case, but did not. They did not attempt to quantify the evidence found but testified in general as to what they would have expected in a case of this type. This testimony is well within the parameters of 12 O.S.Supp.2002, § 2702, as it was based on their "knowledge, skill, experience, training or education ...". *Id.* Their opinions boiled down to statements that based on their experience, they would just have expected more of the victim's bodily residue to be under Ballentine's fingernails. The majority finds this testimony improper as these investigators/scientists had not seen a disembowelment case before and they were not experts in "disembowelment forensics". To take such a restricted view is not only to ignore past caselaw from this Court dealing with expert witnesses but also places too much reliance on a label and ultimately deprives the parties of needed expertise. *Slaughter v. State*, 1997 OK CR 78, ¶¶ 20–21, 950 P.2d 839, 849 ("[l]abels can be misleading and might otherwise deprive a party of expertise which is needed to develop

68. *See Black v. State*, 2001 OK CR 5, ¶ 97, 21 P.3d 1047, 1078.

the issues in the case"). Each of the experts had experience in investigating homicides where a potential defendant was tested for victim residue under the fingernails and could appropriately draw on that experience to give the general opinion they voiced at trial. Further, I cannot join in the majority's unsupported reference to the field of expertise allegedly known as "disembowelment forensics".

¶ 3 I also disagree with the majority's conclusion that "... much of Wilson's 'expert' testimony was based not on 'specialized knowledge' or experience, but rather on logic and common sense." at 279. The average person has no perspective on what type of evidence can be extracted from a person suspected of committing a homicide, or how much. It is the expert's "specialized knowledge" upon which they draw to apply the "logic and common sense" in the situation at issue. I find no error in the testimony of Wilson, Callum or Taylor as it was well within their "knowledge, skill, experience, training, or education ..." to express a generalized opinion that they would have expected to find more of the victim's residue under Ballentine's fingernails.

¶ 4 Further, I disagree with the Court's after-the-fact statement, "this Court finds that the State overestimated this task [i.e. proving Ballentine innocent] and 'overworked' this case in this regard." at 283. As any lawyer who has tried criminal cases to a jury knows, you can never take for granted how a jury will respond to evidence. This is especially true in a case where the State not only had to prove Appellant guilty beyond a reasonable doubt, but also prove Ballentine innocent to combat Appellant's defense. I cannot join in a statement that fails to recognize, much less acknowledge, the thoroughness with which the State presented this case to the jury. Usually, when we observe this level of competence in trial counsel, we compliment the effort, not disparage it. Presenting a cold case to a trier of fact is always a challenge for prosecutors due to the passage of time. To their credit, the victim, Audrey Harris, was not forgotten and the perpetrator of this vile act has been held accountable for his acts.

¶ 5 With the above exceptions, I join in the affirming of the judgment and sentences in this case.