ROWLAND, JUDGE:
 

 ¶1 Appellant Howard Shelton Mason, Jr., appeals his Judgment and Sentence from the District Court of McClain County, Case No. CF-2015-180, for Murder in the First Degree, in violation of 21 O.S.Supp.2011, § 701.7(A). The Honorable Thad Balkman, District Judge, presided over Mason's jury trial and sentenced Mason, in accordance with the jury's verdict, to life imprisonment without the possibility of parole. Mason appeals raising the following issues:
 

 (1) whether the evidence presented at trial was insufficient to sustain his conviction for First Degree Malice Aforethought Murder;
 

 (2) whether the trial court erred in failing to suppress his statement;
 

 (3) whether the trial court erred in allowing the State to bolster a witness's extrajudicial identification with third-party testimony;
 

 (4) whether the trial court erred by failing to give a cautionary jury instruction on eyewitness identification;
 

 (5) whether his trial was rendered fundamentally unfair by the admission of improper opinion testimony;
 

 (6) whether an enhancement statute resulted in a violation of the
 
 ex post facto
 
 clauses; and
 

 (7) whether ineffective assistance of counsel deprived him of a fair trial.
 

 ¶2 We find relief is not required and affirm the Judgment and Sentence of the district court.
 

 Background
 

 ¶3 On October 15, 2006, Lowry Ewing, went to see his friend, Burney Ray Bounds, at Bounds' house located south of Dibble off of Highway 76 in McClain County. When he arrived, Ewing noticed that Bounds' car, a blue Subaru wagon, was gone and the front door of the house was ajar. He was alarmed because this was out of the ordinary; Bounds never left his house unlocked. Ewing entered the house and noticed that the front room was torn up; furniture was turned upside down and papers were strewn about the floor. Ewing knew Bounds to keep a tidy house so he assumed that Bounds' home had been broken in to and burgled. Ewing walked toward the telephone in the bedroom to call Bounds and tell him about the condition
 in which he discovered his house. When he approached the bedroom door Ewing saw Bounds face down on the floor with his hands and feet tied behind him. Ewing knew that Bounds was dead. He backed up and went to the kitchen where he located Bounds' cell phone and called 911. Ewing waited outside for the police to arrive. When the authorities arrived it was confirmed that Bounds was dead. It was subsequently determined that the manner of death was homicide and that Bounds had died from traumatic asphyxia.
 

 ¶4 During the subsequent investigation it was discovered that in the late afternoon the day before Bounds' body was discovered, Bounds stopped at DJ's convenience store to fill up with gas and purchase gum as was his custom about once or twice a week. When Bounds went inside the store he spoke with his friend, Clara Rogers. Bounds told Rogers that he had picked someone up at the casino. When Rogers looked toward Bounds' car she noticed a man with long, black, curly hair and a bandana around his head. He was standing by Bounds' car waiting for him to exit the store. Rogers could not stop looking at the man because he was standing with his arms crossed glaring at her.
 

 ¶5 On the night of October 14, 2006, at around 10:00 to 11:00 p.m., Amanda Mayhew was driving with her mother on Highway 76 when they saw a skinny man, about fifty-eight or fifty-nine years old, beside a small blue station wagon that was up on jacks with a flat tire. A few days later when Mayhew drove past the area again, she noted that the blue station wagon was gone but a tire and jack had been left behind. By then she had heard about the homicide and that the police were looking for a blue station wagon so she notified the authorities.
 

 ¶6 On October 14, 2006, at around 10:00 to 10:30 p.m., Dibble Reserve Police Officer Ricky Lee Peterman was driving a marked patrol unit traveling north on Highway 76 when he saw a man on the side of the road changing a tire on a small car like a Subaru. Peterman noted that the man was about five foot nine or ten and weighed approximately 155 or 160 pounds. He looked a little scruffy with long hair and a beard. Peterman pulled in behind the disabled vehicle and asked the man if he needed help. The man declined and Peterman left. Peterman learned the following day that there had been a homicide a block south of where he saw the man changing the tire.
 

 ¶7 On the morning of October 15, 2006, Terry Joe McDonald and his wife were driving north near Southwest 3
 
 rd
 
 and MacArthur in Oklahoma City when they noticed a light blue Subaru wagon in a vacant lot. They noticed the car because they drove a Subaru and at the time there were very few Subarus in the state. The car was parked about a hundred yards from the interstate. Although it was a misty, rainy day, its windows were rolled down and there was no one inside the vehicle. The following day, MacDonald saw on the news that police were looking for a Subaru that had been involved in a crime. The news story gave a description of the car and the tag number. MacDonald went back to where he had seen the abandoned Subaru which was still there and confirmed that it was the car the police were looking for. He called and reported the missing vehicle.
 

 ¶8 The OSBI was involved in the investigation of the crime and processed items found in Bounds' house and car. Duct tape had been used extensively to bind Bounds and was found on his hands, feet, neck, and mouth. It was also used to secure him to the bed. This duct tape was collected and examined as were several hairs found at the crime scene. OSBI Criminalist Chris Davis, certified as a latent fingerprint examiner, found usable latent prints not belonging to Bounds on pieces of duct tape stretching from Bounds' hands to the bed, on the partial roll of unused tape on the bed, and on a piece of tape attached to the headboard of the bed.
 

 ¶9 OSBI Criminalist Wendy Duke, who specialized in forensic biology, evaluated hairs found at the crime scene for the potential to conduct DNA analysis. Of twelve hairs deemed potentially capable of producing a DNA profile, one collected from a shirt found underneath Bounds' body produced enough DNA to develop a partial profile. This partial profile was submitted to the Combined DNA Index System (CODIS) which houses DNA profiles from other forensic cases as well as convicted offender samples.
 

 ¶10 Although the case went cold for a while, it was subsequently discovered that
 Howard Shelton Mason, Jr., was a possible match to the forensic evidence. A DNA profile was developed from a known buccal swab taken from Mason and this profile was compared to the partial DNA profile developed from the hair found at the scene of the homicide. OSBI Criminalist, Antji Stambaugh, with the forensic biology unit, determined that Mason could not be excluded as a donor for the DNA profile from the hair collected from the scene; the statistical probability of the same profile belonging to a random person in the population was 1 in 4.66 million. Mason's fingerprint cards were also compared to the latent prints taken from duct tape found at the crime scene. Four of the latent prints matched Mason's known prints.
 

 ¶11 After Mason was identified as a suspect in the case Clara Rogers was approached by the police and asked to view photographs to see if she could identify the person she saw outside the convenience store waiting for Bounds. Despite the fact that Rogers was asked to view the pictures in 2015, some eight years after Bounds had been killed, Rogers identified a photograph of Mason as the man who she saw with Bounds the day before he was found dead.
 

 ¶12 Mason was located and questioned by OSBI Agents David Gatlin and Josh Dean. During the audiotaped interview Mason admitted that he had been in Oklahoma hitchhiking along I-40 around the time Bounds was killed. Mason told the agents that an older fellow driving a station wagon picked him up. The man had work for him to do; he cleaned out the man's chicken coop and washed his dog. Mason said he stayed a couple of hours and the man took him back to the interstate. Mason said that he "didn't hurt nobody." He was subsequently arrested.
 

 1.
 

 ¶13 Mason argues that the evidence presented at trial was insufficient to sustain his conviction for first degree malice murder. This Court reviews challenges to the sufficiency of the evidence in the light most favorable to the State and will not disturb the verdict if any rational trier of fact could have found the essential elements of the crime charged to exist beyond a reasonable doubt.
 
 Head v. State
 
 ,
 
 2006 OK CR 44
 
 , ¶ 6,
 
 146 P.3d 1141
 
 , 1144.
 
 See also
 

 Spuehler v. State
 
 ,
 
 1985 OK CR 132
 
 , ¶ 7,
 
 709 P.2d 202
 
 , 203-04. "The credibility of witnesses and the weight and consideration to be given to their testimony are within the exclusive province of the trier of facts."
 
 Rutan v. State
 
 ,
 
 2009 OK CR 3
 
 , ¶ 49,
 
 202 P.3d 839
 
 , 849. We do not "second-guess the fact-finding decisions of the jury; we accept all reasonable inferences and credibility choices that tend to support the jury's verdict."
 
 Mitchell v. State
 
 ,
 
 2018 OK CR 24
 
 , ¶ 11,
 
 424 P.3d 677
 
 , 682. "Pieces of evidence must be viewed not in isolation but in conjunction, and we must affirm the conviction so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded the defendant was guilty beyond a reasonable doubt."
 
 Davis v. State
 
 ,
 
 2004 OK CR 36
 
 , ¶ 22,
 
 103 P.3d 70
 
 , 78 (quoting
 
 Matthews v. State
 
 ,
 
 2002 OK CR 16
 
 , ¶ 35,
 
 45 P.3d 907
 
 , 919-20 ). Additionally, this Court has held that "the law makes no distinction between direct and circumstantial evidence and either, or any combination of the two, may be sufficient to support a conviction."
 
 Mitchell
 
 ,
 
 2018 OK CR 24
 
 , ¶ 11,
 
 424 P.3d at 682
 
 .
 

 ¶14 Mason concedes that there is no dispute that Bounds died or that his death was unlawful. Rather, Mason asserts that upon close examination of the trial testimony and evidence, no rational trier of fact could have found beyond a reasonable doubt that the State proved he caused Bounds' death. As Mason points out, the evidence presented at trial, when viewed in the light most favorable to the State, established that he was at Bounds' home shortly before Bounds' was found dead on October 15, 2006. He acknowledges that the State presented evidence that he was seen with Bounds and his vehicle on the afternoon of October 14, 2006 and that two witnesses saw a man fitting his description changing a tire on a vehicle matching the description of Bounds' Subaru later that same day. Mason argues, however, that this evidence merely placed him with Bounds prior to his death. He goes on to acknowledge that the fingerprints and DNA profile obtained from a hair tie him to the crime scene but do nothing other than raise a suspicion of guilt because there was no additional evidence showing anything more than his presence
 at the scene. Mason notes that unidentified fingerprints were found on other objects in the house and the evidence presented at trial is insufficient to support his conviction because the State did not prove beyond a reasonable doubt that he was the only person who could have committed the crime. He argues that the State's case against him was based entirely upon conjecture and speculation.
 

 ¶15 Mason's argument is unpersuasive. His fingerprints and the hair from which the DNA profile was extracted were found in close proximity to Bounds' body and on items used to restrain Bounds during the fatal attack. The forensic evidence connecting Mason to the attack must be considered along with the other evidence placing Mason with Bounds the day before Bounds' body was discovered. Considered in the aggregate and in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged offense, beyond a reasonable doubt.
 

 2.
 

 ¶16 When Mason was identified as a suspect in this case he was located at the El Paso Transitional Center in El Paso, Texas. OSBI Agent David Gatlin secured a warrant for Mason's arrest and on May 5, 2015, Gatlin went with OSBI Agent Josh Dean to the transitional center and interviewed Mason. Mason subsequently filed a motion to suppress his statement arguing that it was inadmissible because it was made during a custodial interrogation before he was advised of his rights pursuant to
 
 Miranda v. Arizona
 
 .
 
 [1]
 
 Prior to trial the court held a
 
 Jackson v. Denno
 

 [2]
 
 hearing to address the admissibility of Mason's statement. The trial court denied his motion to suppress and Mason argues on appeal that this ruling was error. Mason did not renew his objection to the introduction of his statement at trial. He has therefore, waived review of this issue on appeal for all but plain error.
 
 Seabolt v. State
 
 ,
 
 2006 OK CR 50
 
 , ¶ 4,
 
 152 P.3d 235
 
 , 237. "Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial."
 
 Mitchell v. State
 
 ,
 
 2016 OK CR 21
 
 , ¶ 24,
 
 387 P.3d 934
 
 , 943.
 
 See also
 

 Hogan v. State,
 

 2006 OK CR 19
 
 , ¶ 38,
 
 139 P.3d 907
 
 , 923.
 

 ¶17 We review the trial court's ruling on a motion to suppress for an abuse of discretion.
 
 Bramlett v. State,
 

 2018 OK CR 19
 
 , ¶ 10,
 
 422 P.3d 788
 
 , 793 (citing
 
 State v. Pope
 
 ,
 
 2009 OK CR 9
 
 , ¶ 4,
 
 204 P.3d 1285
 
 , 1287 ). We defer to the trial court's findings of fact unless they are clearly erroneous and we review the trial court's legal conclusions derived from those facts
 
 de novo
 
 .
 
 Bramlett
 
 ,
 
 2018 OK CR 19
 
 , ¶ 10,
 
 422 P.3d at
 
 793 (citing
 
 Gomez v. State
 
 ,
 
 2007 OK CR 33
 
 , ¶ 5,
 
 168 P.3d 1139
 
 , 1141-42 ).
 

 ¶18 It is well established that "police officers are not required to administer
 
 Miranda
 
 warnings to everyone whom they question."
 
 Oregon v. Mathiason
 
 ,
 
 429 U.S. 492
 
 , 495,
 
 97 S.Ct. 711
 
 , 714,
 
 50 L.Ed.2d 714
 
 (1977). Rather,
 
 Miranda
 
 warnings are only required when a person is subject to a custodial interrogation which occurs where questioning is initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of his freedom in any significant way.
 
 Miranda
 
 , 384 U.S. at 467, 86 S.Ct. at 1624
 
 . See also
 

 Little v. State
 
 ,
 
 1981 OK CR 46
 
 , ¶ 4,
 
 627 P.2d 445
 
 , 447. A person is in custody for purposes of
 
 Miranda
 
 when there is "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."
 
 Stansbury v. California
 
 ,
 
 511 U.S. 318
 
 , 322,
 
 114 S.Ct. 1526
 
 , 1529,
 
 128 L.Ed.2d 293
 
 (1994) (
 
 per curiam
 
 ) (quoting
 
 California v. Beheler
 
 ,
 
 463 U.S. 1121
 
 , 1125,
 
 103 S.Ct. 3517
 
 , 3520,
 
 77 L.Ed.2d 1275
 
 (1983) (
 
 per curiam
 
 ) ). The relevant inquiry as to whether a suspect is in custody is how a reasonable person in the suspect's position would have understood the situation.
 
 Berkemer v. McCarty
 
 ,
 
 468 U.S. 420
 
 , 442,
 
 104 S.Ct. 3138
 
 , 3151,
 
 82 L.Ed.2d 317
 
 (1984).
 

 ¶19 Custody, for purposes of
 
 Miranda
 
 warnings, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."
 

 Howes v. Fields,
 

 565 U.S. 499
 
 , 508-09,
 
 132 S.Ct. 1181
 
 , 1189,
 
 182 L.Ed.2d 17
 
 (2012). The fact that Mason was in a transitional center pursuant to an unrelated conviction at the time he was interviewed about his involvement in Bounds' death does not, however, mean that he was presumptively "in custody" for purposes of
 
 Miranda
 
 .
 
 See
 

 Fields,
 

 565 U.S. at 508
 
 ,
 
 132 S.Ct. at 1188-89
 
 (a prisoner who is taken from his cell to be interviewed in a conference room on a matter unrelated to the crime under which he was being held is not presumptively in custody for purposes of
 
 Miranda
 
 ).
 

 ¶20 It is also of little consequence that the OSBI agents had secured an arrest warrant and had the intent to arrest Mason at the end of the interview because they did not convey this information and intent to Mason. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."
 
 Stansbury,
 

 511 U.S. at 325
 
 ,
 
 114 S.Ct. at 1530
 
 ("an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave").
 
 See also
 

 Berkemer
 
 ,
 
 468 U.S. at 442
 
 ,
 
 104 S.Ct. at 3151
 
 (The suspect was not "in custody" for purposes of
 
 Miranda
 
 where the officer decided as soon as the suspect stepped out of his car to arrest him at the conclusion of the encounter but did not convey that intent to the suspect. The Court held that "a policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time ..."). Other relevant factors to consider include: (1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the questioning; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the end of the questioning.
 
 Fields
 
 ,
 
 565 U.S. at 509
 
 ,
 
 132 S.Ct. at 1189
 
 .
 

 ¶21 Testimony at the
 
 Jackson v. Denno
 
 hearing indicates that at the time of the interview Mason was in a transitional center where his freedom of movement was not restrained at all times; he was free to leave at least some of the time when he went to work outside the facility. The extent to which he could freely move about the facility was unclear. Although a Texas Ranger was in the conference room during the interview, the record does not show whether Mason was escorted to the conference room by the Texas Ranger or whether he went to the room unaccompanied. The interview lasted only fifteen to twenty minutes and there is no indication from the record that Mason was restrained during the questioning. Although Mason was not released at the end of the interview and it is clear that Agents Gatlin and Dean intended to arrest him, there is no indication that they conveyed this information to Mason before or during the interview. Mason was unaware of the extent to which his freedom of movement was actually limited. Mason has provided no evidence suggesting that a reasonable person in his circumstances would have believed he was not free to terminate the interview and leave before he specifically asked if he could leave. On the record before this Court, considering the totality of the circumstances surrounding the interview, we find that Mason has failed to show that the agents were required to advise him of his
 
 Miranda
 
 rights prior to the interview and that the trial court's ruling denying his motion to suppress was error. Relief is not required.
 

 3.
 

 ¶22 Rogers testified at trial that she saw Mason at the convenience store with Bounds the day before Bounds was found dead and she identified Mason at trial as the person she saw. Rogers also testified that she made two extra-judicial identifications of Mason; she identified him before trial from a photographic lineup presented to her by OSBI Agent David Gatlin and also at preliminary hearing. In addition, Agent Gatlin testified at trial about Rogers' extra-judicial identification of Mason from the photographic lineup. Mason argues on appeal that the trial court erred in allowing Agent Gatlin to bolster Rogers' testimony about the extrajudicial identification. Mason concedes, however,
 that he did not raise this objection below, thus waiving all but plain error.
 
 See
 

 Lamar v. State
 
 ,
 
 2018 OK CR 8
 
 , ¶ 43,
 
 419 P.3d 283
 
 , 295. "Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial."
 
 Mitchell
 
 ,
 
 2016 OK CR 21
 
 , ¶ 24,
 
 387 P.3d at 943
 
 .
 

 ¶23 This Court recently held that 12 O.S.2011, §§ 2801(B)(1)(c) & 2802 permit the introduction of extrajudicial identification testimony as substantive evidence-both by the identifier and third parties present at the prior identification-as long as the declarant testifies at trial and is subject to cross-examination concerning the statement of identification.
 
 Davis v. State
 
 ,
 
 2018 OK CR 7
 
 , ¶¶ 26-27,
 
 419 P.3d 271
 
 , 280-81 (overruling prior decisions to the contrary). Agent Gatlin's testimony concerning Rogers' extrajudicial identifications of Mason was permissible because Rogers testified at trial and was subject to cross-examination about the out-of-court identifications. There was no plain error and relief is not required.
 

 4.
 

 ¶24 Mason argues that the trial court erred in failing to give the jury,
 
 sua sponte
 
 , a cautionary instruction about the reliability of eyewitness identification. The failure to request an instruction on the hazards of eyewitness testimony or object to the instructions given waives review on appeal for all but plain error.
 
 Mitchell,
 

 2016 OK CR 21
 
 , ¶ 24,
 
 387 P.3d at 943
 
 .
 

 ¶25 The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court.
 
 Cipriano v. State
 
 ,
 
 2001 OK CR 25
 
 , ¶ 14,
 
 32 P.3d 869
 
 , 873. This Court has held that, "[i]n cases in which the eyewitness identification is a critical element of the prosecution's case
 
 and
 
 serious questions exist concerning the reliability of that identification, a cautionary instruction should be given which advises the jury regarding the factors to be considered."
 
 McDoulett v. State
 
 ,
 
 1984 OK CR 81
 
 , ¶ 9,
 
 685 P.2d 978
 
 , 980 (emphasis added).
 
 See also
 

 Robinson v. State
 
 ,
 
 1995 OK CR 25
 
 , ¶ 56,
 
 900 P.2d 389
 
 , 404 ("a cautionary eyewitness identification instruction is not necessary where no serious question exists concerning the reliability of the identification"). This Court has held that:
 

 [A] cautionary instruction is not necessary if the following conditions are met: (1) If there was a good opportunity for positive identification; (2) if the witness is positive in his identification; (3) if the identification is not weakened by prior failure to identify; and (4) if the witness remains positive as to the identification, even after cross-examination.
 

 Langley v. State
 
 ,
 
 1991 OK CR 66
 
 , ¶ 17,
 
 813 P.2d 526
 
 , 530.
 

 ¶26 Although Rogers' initial identification of Mason occurred a significant time prior to trial, she had good opportunity for positive identification and she remained consistent and positive in her identification, even after cross-examination. Thus, no cautionary instruction was required. There was no error here.
 

 5.
 

 ¶27 Mason argues that his trial was rendered fundamentally unfair by the admission of improper opinion testimony that invaded the province of the jury and violated his constitutional right to a fair trial. He challenges OSBI Criminalist Chris Davis' testimony that he compared Mason's known fingerprints and palm prints with latent prints found at the scene of the homicide and he concluded that Mason's known prints matched four latent prints found at the scene. Mason does not challenge the admissibility of fingerprint evidence. Nor does he argue that Davis should not have been allowed to testify about his observations regarding the latent and known prints and the similarities he observed. Rather, Mason argues that Davis' testimony suggesting that it was an absolute fact that the latent prints were made by him exceeded the bounds of science and invaded the province of the jury.
 

 ¶28 Mason acknowledges that he failed to object to this testimony at trial on the same grounds and has therefore waived review of this issue on appeal for all but plain error.
 
 See
 

 Grissom v. State
 
 ,
 
 2011 OK CR 3
 
 , ¶ 64,
 
 253 P.3d 969
 
 , 991. Therefore, we review Mason's claim pursuant to the test for plain
 error, set forth above, and determine whether he has shown an actual error, which is plain or obvious, and which affects his substantial rights.
 
 Mitchell
 
 ,
 
 2016 OK CR 21
 
 , ¶ 24,
 
 387 P.3d at 943
 
 .
 

 ¶29 Mason notes that fingerprint evidence has "long been recognized as the strongest kind of circumstantial evidence and the surest form of identification."
 
 Stacy v. State,
 

 49 Okl.Cr. 154
 
 , 157,
 
 292 P. 885
 
 , 887 (1930). However, he asserts that in the last decade serious questions have been raised about the validity of these expressions of absolute certainty. He avers that "[s]cholars have concluded that fingerprint examiners' claims to be able to individualize, that is to determine the source of an unknown print to the exclusion of all other possible sources in the universe, are not supported by empirical evidence." In support of his argument Mason cites to scholarly and scientific articles which call into question the ability of fingerprint examiners to state with absolute certainty that a particular latent print matches a known print. He also cites to two cases from Massachusetts which caution that testimony individualizing latent fingerprints to known fingerprints should be offered as opinion rather than as infallible fact.
 
 [3]
 

 ¶30 A similar argument was set forth in
 
 Webster v. State
 
 ,
 
 2011 OK CR 14
 
 , ¶¶ 65-68,
 
 252 P.3d 259
 
 , 277-78. The Court noted in
 
 Webster
 
 that the appellant failed to cite to any jurisdiction which had ruled in support of his position. The Court also noted that Webster could have used the scholarly materials which raised questions about the validity and admissibility of fingerprint analysis to cross-examine the fingerprint experts at trial but he did not do so. The Court further found that Webster had failed to follow the proper procedure for supplementing the record in this Court with this kind of evidence. It was also noted that the fingerprint identification testimony could not plausibly have resulted in a mistaken identification or a wrongful conviction since Webster was also implicated in the commission of the crime by DNA evidence. Consequently, the Court did not address the claim further but declined to find plain error in the admission of the testimony about the latent prints.
 

 ¶31 We reach the same conclusion here. While Mason cited to two cases from Massachusetts in support of his argument, those cases are merely persuasive authority and not particularly so. As in
 
 Webster
 
 , the scholarly and scientific articles could have been, but were not, used at trial to cross-examine the fingerprint expert about the reliability of his conclusions regarding the comparison of fingerprints and palm prints. Also, as in
 
 Webster
 
 , Mason was not connected to the crime scene by fingerprint evidence alone; he was also placed at the scene of the homicide by DNA evidence and a person fitting his description was placed by eyewitnesses with the victim and near the victim's home around the time of the homicide. Additionally, his own statement to the OSI agents placed him with the victim and at the victim's home around the time of the homicide. The introduction of testimony about the latent prints was not actual error and did not affect Mason's substantial rights. We find no error and relief is not required.
 

 6.
 

 ¶32 Mason killed Bounds in 2006. At the time the crime was committed, first degree murder trials where the death penalty was not sought were held in a single stage proceeding and the punishment was not subject to enhancement by evidence of prior felony convictions. In 2013, the Legislature enacted 21 O.S. § 701.10-1(A) which provided that:
 

 Upon conviction or adjudication of guilt of a defendant of murder in the first degree, wherein the state is not seeking the death penalty but has alleged that the defendant has prior felony convictions, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to life imprisonment without parole or life imprisonment, wherein the state shall be given the opportunity to prove any prior felony convictions beyond a reasonable doubt. The proceeding shall be conducted by the trial judge before the same trial jury as soon as practicable without presentence investigation.
 

 Pursuant to Section 701.10-1(A), the State filed an Enhancement Page along with the Information alleging that Mason had three prior felony convictions. Mason argues in his sixth proposition that the application of this enhancement statute to his case violated the prohibitions against
 
 ex post facto
 
 laws.
 

 ¶33 The United States Constitution and Oklahoma Constitution expressly prohibit states from enacting
 
 ex post facto
 
 laws. U.S. Const. art. I, § 10; Okla. Const. art. II, § 15. This Court interprets the ex
 
 post facto
 
 provisions in the Oklahoma Constitution consistent with federal jurisprudence.
 
 Murphy v. State
 
 ,
 
 2012 OK CR 8
 
 , ¶ 42,
 
 281 P.3d 1283
 
 , 1294 (citing
 
 Maghe v. State,
 

 1967 OK CR 98
 
 , ¶¶ 33-34,
 
 429 P.2d 535
 
 , 540 ). An
 
 ex post facto
 
 law is one which:
 

 (1) criminalizes an act after the act has been committed, (2) increases the severity of a crime after it has been committed; (3) increases the punishment for a crime after it has been committed; or (4) alters the rules of evidence, allowing conviction on less or different testimony than the law required at the time the act was committed.
 

 James v. State
 
 ,
 
 2009 OK CR 8
 
 , ¶ 5,
 
 204 P.3d 793
 
 , 795 (citing
 
 Carmell v. Texas,
 

 529 U.S. 513
 
 , 522-25,
 
 120 S.Ct. 1620
 
 , 1627-29,
 
 146 L.Ed.2d 577
 
 (2000) ). This Court has held that, "[t]he mere fact that a retroactively-applied change in evidentiary rules works to a defendant's disadvantage does not mean the law is
 
 ex post facto.
 
 The issue is whether the change affected the quantum of evidence necessary to support a conviction."
 
 James
 
 ,
 
 2009 OK CR 8
 
 , ¶ 6, 204 P.3d at 795 (citing
 
 Carmell,
 

 529 U.S. at 546-47
 
 ,
 
 120 S.Ct. at
 
 1640 ). Legislative enactments which "merely permit the jury to consider certain kinds of evidence for certain purposes, and are applied to conduct committed before enactment, do not raise
 
 ex post facto
 
 concerns."
 
 Id
 
 .
 

 ¶34 In
 
 James
 
 , this Court found no
 
 ex post facto
 
 violation where a statute allowing the jury to consider certain other crimes evidence was applied to the defendant's trial although it was enacted after commission of the crime.
 
 Id
 
 . at ¶¶ 2-6, 204 P.3d at 794-96.
 
 See also
 

 Hogan v. State,
 

 2006 OK CR 19
 
 , ¶¶ 60-61,
 
 139 P.3d 907
 
 , 930 (Oklahoma statutory amendment allowing admission of "appropriate" "in-life" photograph of the victim in a homicide prosecution, applied to homicide committed before amendment, did not violate defendant's rights under the
 
 ex post facto
 
 clause);
 
 Neill v. Gibson,
 

 278 F.3d 1044
 
 , 1053 (10th Cir. 2001) (Oklahoma statute permitting jury to consider victim-impact evidence in a capital sentencing proceeding, applied to murders committed before enactment, did not violate the
 
 ex post facto
 
 prohibition because it neither changed the quantum of proof nor otherwise subverted the presumption of innocence).
 

 ¶35 The statute at issue in this case did not criminalize an act done before the passing of the law, make the crime greater than it was when committed, inflict a greater punishment than when it was committed, or receive less, or different, testimony than required at the time of the offense to convict Mason. There is no
 
 ex post facto
 
 violation and this proposition is denied.
 

 7.
 

 ¶36 Mason argues defense counsel rendered constitutionally ineffective assistance at trial. This Court reviews claims of ineffective assistance of counsel
 
 de novo,
 
 to determine whether counsel's constitutionally deficient performance, if any, prejudiced the defense so as to deprive the defendant of a fair trial with reliable results.
 
 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 , 687,
 
 104 S.Ct. 2052
 
 , 2064,
 
 80 L.Ed.2d 674
 
 (1984) ;
 
 Malone v. State,
 

 2013 OK CR 1
 
 , ¶ 14,
 
 293 P.3d 198
 
 , 206. Under this test, Mason must affirmatively prove prejudice resulting from his attorney's actions.
 
 Strickland,
 

 466 U.S. at 693
 
 , 104 S.Ct. at 2067 ;
 
 Head,
 

 2006 OK CR 44
 
 , ¶ 23,
 
 146 P.3d at 1148
 
 . "To accomplish this, it is not enough to show the failure had some conceivable effect on the outcome of the proceeding."
 
 Head
 
 , at ¶ 23,
 
 146 P.3d at 1148
 
 . Rather, Mason must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.
 

 Id.
 

 "A reasonable probability is a probability sufficient to undermine confidence in the outcome."
 

 Id.
 

 ¶37 Mason specifically argues defense counsel was ineffective for (1) failing to renew the objection at trial to the admission of
 the statement made during his interview with OSBI agents; (2) failing to object at trial to Agent Gatlin's improper bolstering of the extrajudicial eyewitness identification; (3) failing to object to improper opinion testimony; and (4) failing to object to sentence enhancement procedure. The merits of each of these claims have been addressed and rejected. Mason's ineffective assistance of counsel claim fails on these alleged deficiencies based on lack of prejudice.
 

 DECISION
 

 ¶38 The Judgment and Sentence of the district court is
 
 AFFIRMED
 
 . Pursuant to Rule 3.15,
 
 Rules of the Oklahoma Court of Criminal Appeals
 
 , Title 22, Ch. 18, App. (2018), the
 
 MANDATE
 
 is
 
 ORDERED
 
 issued upon delivery and filing of this decision.
 

 LUMPKIN, P.J.: Concur
 

 LEWIS, V.P.J.: Concur
 

 HUDSON, J.: Concur
 

 KUEHN, J.: Concur
 

 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966).
 

 378 U.S. 368
 
 ,
 
 84 S.Ct. 1774
 
 ,
 
 12 L.Ed.2d 908
 
 (1964).
 

 Commonwealth v. Gambora
 
 ,
 
 457 Mass. 715
 
 ,
 
 933 N.E.2d 50
 
 , 56-58 (2010) ;
 
 Commonwealth v. Joyner
 
 ,
 
 467 Mass. 176
 
 ,
 
 4 N.E.3d 282
 
 , 286-90 (2014).